ELSTON–RICHARDS STORAGE COM-
PANY, a Michigan corporation,
Plaintiff,

v.

INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA, a Pennsyl-
vania corporation, Defendant.

Civ. A. No. 3323.

United States District Court
W. D. Michigan, S. D.

Feb. 2, 1960.

Schmidt, Smith, Howlett & Halliday, Laurence D. Smith, Kingston, Porter & Day, John R. Porter, Grand Rapids, Mich., for plaintiff.

Alexander, Cholette, Buchanan, Perkins & Conklin, Grand Rapids, Mich., William D. Buchanan, Edward D. Wells, Grand Rapids, Mich., for defendant.

STARR, Chief Judge.

Plaintiff, a Michigan corporation having its principal place of business in Grand Rapids, Michigan, is engaged in the warehousing business and the storage of goods as a bailee for hire. Defendant insurance company is a Pennsylvania corporation authorized to do business and issue insurance policies in Michigan. Plaintiff brings this action in pursuance of 28 U.S.C. § 2201 for a declaratory judgment determining its rights under a certain warehouseman's liability policy issued to it by defendant company. The action was tried to the court without a jury.

To present the issues before the court for determination, it is necessary to set forth briefly the factual situation out of which the action arises. On June 23, 1956, in consideration of the premium paid, the defendant issued its warehouseman's liability policy, Form B, No. 9 BWL 8331, in the principal amount of $250,000, thereby insuring plaintiff, subject to the terms of the policy, against

legal liability as a warehouseman for the period of three years. The policy provided in part as follows:

"Indemnity Insurance Company of North America * * * agrees with the insured: * * *

"I. Liability for Property

"To pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed by law upon him as a bailee, for loss or destruction of or damage to property of others contained in the premises;

"II. Investigation, Defense, Supplementary Payments

"(a) To investigate all claims for such loss, destruction or damage of which the company shall have notice as required herein;

"(b) To defend in the insured's name and behalf, any suits or other proceedings which may be brought against the insured to enforce such claims;

"(c) To pay, irrespective of the company's limit of liability stated in Item 4 of the declarations: the expense of adjusting all such claims or suits which may be settled at the option of the company without litigation; all expenses of litigation and all costs taxed against the insured in proceedings defended by the company. * * *

"Conditions * * *

"2. Limits of Liability. The company's aggregate liability for loss or damage arising out of all occurrences or events in any one policy year is limited to the amount specified in Item 4 of the declarations. The company shall not be liable hereunder for any claim or claims *arising from any one event or occurrence* unless the insured's total liability therefor, when determined, shall exceed the deductible amount stated in Item 4 of the declarations, in which event such stated amount shall be deducted from the insured's total liability, and the company shall be liable only in excess of such stated amount. * * *

"Declarations * * *

"Item 4. The limit of the company's liability under Insuring Agreement I shall be: * * * $250,000 subject to a deductible of $2,500."

The only one of plaintiff's several warehousing facilities involved in this action is its Freeman avenue warehouse in Grand Rapids, which was opened and began receiving goods for storage in May, 1956. Under an arrangement between them, the Whirlpool Corporation, a manufacturer, shipped from its factories washer and dryer and combination washer-and-dryer appliances, each packed in a heavy cardboard carton, to plaintiff's Freeman avenue warehouse for storage and for later reshipment by plaintiff upon the order of Whirlpool. These appliances were shipped by Whirlpool in railroad freight cars, each carload consisting of from 90 to 96 appliance units. During the period from about November 1, 1956, to July 19, 1957, Whirlpool shipped 636 carloads of appliances to plaintiff's warehouse for storage, and during that time, upon orders from Whirlpool, plaintiff shipped out 508 carloads, so that during that time plaintiff handled over 50,000 Whirlpool appliances, some of which were handled when received and again handled when shipped out. When a carload of cartoned appliances was received at plaintiff's warehouse, one of its employees would enter the freight car and remove the cartons with a hand truck and place them near the receiving door of the warehouse. Another employee, using a motorized lift truck with a carton-clamp assembly, would then pick up the cartons and remove them to designated areas in the warehouse and stack them in rows, usually four cartons high. When plaintiff received instructions from Whirlpool to ship out stored appliances, a motorized lift truck would be used to pick up the cartoned appliances from the stacks in the warehouse and place them near the warehouse door. The cartons were then

loaded into railroad cars by use of hand trucks. In picking up and moving the cartoned appliances, the padded arms of the lift-truck clamp assembly might be pressed either against the sides or against the front and back of the appliance inside the carton. It appears that in lifting, lowering, and carrying the appliances with the lift truck, the plaintiff usually moved two cartons at a time, one on top of the other, with the clamps gripping the lower carton.

During the period of time involved in this action the plaintiff used two motorized lift trucks with carton-clamp assemblies at its Freeman avenue warehouse. One of these trucks, herein referred to as the "old truck," had been used by the Whirlpool Corporation and was purchased by plaintiff from Whirlpool. The other truck, herein referred to as the "new truck," was purchased by plaintiff from the Morrison Industrial Equipment Company in May, 1956. The carton-clamp assembly on each of these trucks was attached to the front of the truck and consisted of two hydraulically-operated arms equipped with a pad, sometimes called a paddle, on each arm. By proper manipulation the arms on the clamp assembly could be moved together and thus caused to exert horizontal pressure on a carton placed between the open arms. When sufficient pressure was exerted by the padded arms against the carton to hold it firmly, the arms could be moved vertically to raise the carton so that it could be carried and stacked. In the same manner a carton could be removed from a stack, lowered to floor level, and carried.

Both arms of the carton-clamp assembly on the so-called old truck were operated and controlled by a single lever, and by moving the lever the arms of the carton clamp could be moved together or apart simultaneously. The amount of squeeze pressure to be exerted on the cartons by the padded arms of the clamp assembly on the old truck was controlled by a manually-operated pressure-relief valve, and the adjustment of pressure to be applied by both arms was made by turning a screw-type valve. The manager of plaintiff's warehouse had at various times adjusted the pressure-relief valve on the old truck to increase or decrease the squeeze pressure that was to be exerted by the arms of the clamp assembly on the cartons.

When plaintiff opened its Freeman avenue warehouse in May, 1956, it purchased the new lift truck with a carton-clamp assembly from the Morrison Industrial Equipment Company, and its purchase order indicates that the arms of the clamp assembly were to be equipped with pads 21 inches wide and 54 inches high and that the arms were to be independently operated. When this new truck was delivered, it did not have what is referred to as the new carton-clamp assembly, and a so-called "loaner" clamp assembly was installed on the truck. This loaner assembly was similar to the carton-clamp assembly on the old truck, in that one lever operated both arms of the clamp assembly. In October, 1956, the loaner clamp assembly on the new truck was removed and replaced by the seller with a new clamp assembly, the pads on this new assembly having *square* corners and being 21 inches wide and 54 inches high. It may be noted that the pads on the arms of the old truck were 27 inches wide and 54 inches high and had *rounded* corners. The operation of the arms on the new clamp assembly was controlled by two levers, which operated independently, each lever operating one arm. A main relief valve on the new clamp assembly fixed the maximum pressure that could be exerted by the arms at 1,200 pounds per square inch, and there was one manually-operated relief valve connected with one arm, which could be adjusted so as to apply any desired pressure below 1,200 pounds. The testimony indicates that this manually-operated relief valve was never adjusted by either the seller of the new truck or by the plaintiff, and it therefore appears that the new clamp assembly on the new truck was operated at the maximum pressure at all times prior to July 19, 1957. The testimony shows

that when the levers which operated the arms on the new clamp assembly on the new truck were operated and moved simultaneously, the pressure-relief valve connected with one arm would operate automatically on both arms and thus control and equalize the squeeze pressure exerted by the pads on each arm. However, if the lever that operated the arm with the connected pressure-relief valve was moved and then returned to a neutral position, and the lever that operated the other arm was then moved, the pressure-relief valve on the controlled arm did not function, but the maximum pressure would be applied by the uncontrolled arm. In other words, if both levers were operated simultaneously, the pressure-relief valve connected with one arm would automatically control and equalize the pressure applied by both arms, but if the levers were not operated simultaneously, no pressure would be applied by the controlled arm, and the maximum pressure of 1,200 pounds per square inch would be applied by the uncontrolled arm.

There was testimony indicating that the operators of the new lift truck with the new clamp assembly generally operated the levers controlling the arms simultaneously. The principal difference between the clamp assembly on the old truck and the new clamp assembly on the new truck was that one lever operated both padded arms on the old truck, and on the new truck each arm was operated by a separate lever. The plaintiff used the old truck and the new truck with the new clamp assembly to move, handle, and stack the cartoned appliances of the Whirlpool Corporation in the Freeman avenue warehouse from about November 1, 1956, until July 19, 1957.

In May, 1957, a number of cartons containing Whirlpool appliances were opened at the Freeman avenue warehouse, and it was found that the toe plates on many of the appliances were chipped, and some were shipped back to Whirlpool. On July 10th a representative of Whirlpool inspected some of the cartons in the warehouse, and it was discovered that many had creases in them.

At that time four cartons showing creases were opened and the appliances examined, and it was found that the back panel of one appliance was dented and that the side panels of two appliances were creased and dented. On July 19th the representative of Whirlpool returned to the warehouse and 20 cartons showing creases were opened at random to determine the nature and extent of the damage to the appliances. It was found that 18 of the 20 cartoned appliances were damaged, the damage consisting of crease marks on the panels or sides of the appliances, some being dented and some being chipped. There was also toe-plate damage on some of these appliances. The investigation disclosed that the damaged appliances were contained in cartons which showed square-cornered creases. These creases had apparently been made by the square-cornered pads on the arms of the new carton-clamp assembly on the new truck, as the corners of the pads on the arms of the old truck were rounded.

In July, 1957, both the old and new lift trucks were inspected by a representative of the plaintiff and a representative of the seller of the new truck, and at that time plaintiff discovered that there was only one pressure-relief valve on the new clamp assembly on the new truck. At that time it was also determined that the clamp assemblies on both trucks were applying pressure on the cartons too high from the bottom of the cartons, and it was also discovered that the rubber pads on the old truck were worn and damaged and allowed slipping when the cartons were gripped. It was also discovered that one of the arms of the clamp assembly on the new truck was bent, thus allowing unequal application of pressure on the cartons. After the inspection of the lift trucks in July, 1957, the plaintiff had a second pressure-relief valve installed and larger pads placed on the clamp assembly of the new truck and new pads placed on the clamp assembly of the old truck.

After this inspection of the damage to the appliances on July 19, 1957, the

Whirlpool Corporation instructed the plaintiff not to ship out any cartoned appliances where the cartons showed crease marks, and it requested plaintiff to inspect all the cartons in the warehouse and sort out and segregate all cartons that were creased. In the course of the inspection all cartons that showed square-cornered creases were segregated and shipped back to Whirlpool. There were approximately 15,000 to 17,000 cartoned Whirlpool appliances in the plaintiff's warehouse on July 15, 1957, and of these approximately 3,755 were segregated because of crease marks in the cartons and returned to Whirlpool. Approximately 500 appliances, which at the instruction of Whirlpool plaintiff had shipped to its customers, were returned by the customers to Whirlpool because of their damaged condition. It appears that Whirlpool repaired the damaged appliances that had been returned to it by its dealers and by plaintiff and that it then asserted a claim against plaintiff for damages in the amount of $99,136.95. In pursuance of the insurance policy in question plaintiff then advised the defendant of Whirlpool's claim for damages. In its letter denying liability defendant stated:

"Our investigation has developed that the appliances damaged were handled by you in such a manner that only one unit was subject to damage each time the alleged defective truck was used to handle the appliances.

"Under the above policy, condition #2 'Limits of Liability' stipulates 'The company shall not be liable hereunder for any claim or claims arising from any one event or occurrence unless the insured's total liability therefor, when determined, shall exceed the deductible amount stated in Item 4 of the declarations, in which event such stated amount shall be deducted from the insured's total liability, and the company shall be liable only in excess of such stated amount.'

"Although the exact damage claim has not been determined, it is evident that the damage from any one event (movement of maximum of two appliances at one time) will not exceed the deductible amount of $2,500. Therefore, we are compelled to advise you that there will be no participation on the part of this company in connection with this claim."

It appears from the testimony that the Whirlpool appliances stored in plaintiff's Freeman avenue warehouse were damaged during the period from about November 1, 1956, to July 19, 1957. Although somewhat confusing, the testimony reasonably establishes that the damage to the appliances was caused by the application of excessive pressure by the carton clamps of the new clamp assembly on the new truck, which were equipped with square-cornered pads 21 inches wide. Not all appliances handled by the new lift truck with the new clamp assembly were damaged. However, a great many were damaged, and the evidence clearly establishes that appliances were damaged from time to time during the period of about nine months that the new lift truck with the new clamp assembly was used. That is, the damaged appliances were not all damaged at one time or on one day, but were damaged from day to day and from time to time as they were handled by the plaintiff in its Freeman avenue warehouse.

It is clear that an actual controversy exists between the parties to this action relative to the interpretation of the limits-of-liability provision hereinbefore quoted in the defendant's insurance policy. See State Farm Mutual Automobile Ins. Co. v. Mossey, 7 Cir., 195 F.2d 56, 58; Denham v. La Salle-Madison Hotel Co., 7 Cir., 168 F.2d 576; Maryland Casualty Co. v. Consumers Finance Service, Inc., of Pennsylvania, 3 Cir., 101 F.2d 514, 515.

In its complaint the plaintiff asks for a judgment declaring that under the insurance policy in suit the defendant is

legally obligated to protect and defend it against liability for all claims of the Whirlpool Corporation, and that defendant is legally obligated to pay such sum as it shall be required to pay Whirlpool for damages to Whirlpool's appliances stored in its warehouse. Before discussing the law applicable to the question as to whether the damage to the Whirlpool appliances arose from "one event or occurrence," the court will consider provision No. 5 of the conditions of the policy in question, which provides:

"No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company."

It appears that the Whirlpool Corporation has not obtained any judgment against the plaintiff on its claim for damages and that defendant has not expressly waived the condition precedent in the above provision of its policy that no action shall lie against it until the plaintiff's obligation to pay Whirlpool shall have been finally determined by a judgment after actual trial or by written agreement. However, in its answer and amendment defendant denies liability to plaintiff for the damages to Whirlpool appliances only on the ground that the damages did not arise from "one event or occurrence," and it did not raise the question of this condition precedent in its answer or in the course of the trial. Furthermore, testimony as to the claim of Whirlpool against the plaintiff for damages to its appliances was admitted without objection, and defendant admits that under its policy it is obligated to investigate all claims and defend any action instituted by Whirlpool against plaintiff for damages arising from its alleged negligence. The court accordingly concludes that the defendant has waived its right to assert this condition precedent as a defense to plaintiff's prayer for a declaratory judgment as to its rights under the policy in question. See 1 Am.Jur., Actions, § 34; 3 Williston on Contracts, Rev.Ed., § 689.

■ The policy in suit provides that the defendant shall not be liable for any "claim or claims arising from any one event or occurrence" unless the plaintiff's total liability therefor exceeds the deductible amount of $2,500. Therefore, the principal question before the court is whether the entire damage to Whirlpool appliances in the plaintiff's warehouse during a period of about nine months arose from and constituted "one event or occurrence," or whether the damage to each Whirlpool appliance arose from and constituted "one event or occurrence." The plaintiff contends that the policy provision "arising from any one event or occurrence" means damages arising from a single cause, no matter how many times the cause is manifested. In other words, plaintiff contends that as the entire damage to the Whirlpool appliances resulted from one cause, that is, the operation of the new lift truck with the new clamp assembly, it constituted "one event or occurrence." On the other hand, defendant denies liability under its policy on the ground that the damage to the Whirlpool appliances was caused from time to time during about nine months and arose from many separate events and occurrences and did not arise from any "one event or occurrence." In other words, defendant contends that the damage to each appliance arose from and constituted "one event or occurrence." It is admitted by both parties that the damage to any one or two of the appliances at any one time did not exceed the deductible amount of $2,500.

■ The law is well established that in an action against an insurer the burden of proof is upon the insured to establish that its claim falls within the provisions of the policy of insurance. See Imperial Fire Insurance Company v. Coos County, 151 U.S. 452, 462, 14 S.Ct. 379, 38 L.Ed. 231; Fidelity Union Fire Ins. Co. of Dallas, Tex., v. Kelleher, 9

Cir., 13 F.2d 745, 746; Hillcrea Export & Import Co. v. Universal Ins. Co., D.C., 110 F.Supp. 204, 207, affirmed 2 Cir., 212 F.2d 206, certiorari denied 348 U.S. 834, 75 S.Ct. 57, 99 L.Ed. 657; Williams v. Detroit Fire & Marine Ins. Co., 280 Mich. 215, 218, 273 N.W. 452; 15 Cyclopedia of Federal Procedure, 3d Ed., § 90.83.

It is a well-recognized rule of construction that in case of ambiguity or doubt as to the meaning of language used in an insurance policy, it shall be construed in favor of the insured, and that exceptions to the liability provided for in the policy are to be construed against the insurer. Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 85, 54 S.Ct. 590, 78 L.Ed. 1137; United States Fidelity & Guaranty Company v. Guenther, 281 U.S. 34, 37, 50 S.Ct. 165, 74 L.Ed. 683; Fireman's Fund Insurance Company of San Francisco v. Hanley, 6 Cir., 252 F.2d 780, 785, 786; West Michigan Dock & Market Corporation v. St. Paul-Mercury Indemnity Co., D.C., 82 F.Supp. 403, 405; Burns v. Mutual Ben. Life Ins. Co. of Newark, N. J., D.C., 79 F.Supp. 847, 851, 852; Hilburn v. Citizens' Mutual Automobile Insurance Company, 339 Mich. 494, 498, 64 N.W.2d 702; Ebert v. Prudential Insurance Company of America, 338 Mich. 320, 325, 61 N.W.2d 164; VanZanten v. National Casualty Company, 333 Mich. 28, 36, 37, 52 N.W.2d 581.

It is also a well-recognized rule of construction that the terms of an insurance policy shall be construed in the plain, ordinary, and popular sense of the language and words used. Hooker v. New York Life Ins. Co., 7 Cir., 161 F.2d 852, 856; West Michigan Dock & Market Corporation v. St. Paul-Mercury Indemnity Co., D.C., 82 F.Supp. 403, 406; Burns v. Mutual Ben. Life Ins. Co. of Newark, N. J., D.C., 79 F.Supp. 847, 852; Rasmussen v. Equitable Life Assurance Society of the United States, 293 Mich. 482, 485, 292 N.W. 377; Wozniak v. John Hancock Mutual Life Ins. Co., 288 Mich. 612, 615, 286 N.W. 99; Mondou v. Lincoln Mutual Casualty Co.,

283 Mich. 353, 358, 278 N.W. 94. It is implicit in this rule of construction that a court should not read ambiguity, doubt, and equivocation into words of common meaning and understanding. Bergholm v. Peoria Life Ins. Co., 284 U.S. 489, 492, 52 S.Ct. 230, 76 L.Ed. 416; Sterneck v. Equitable Life Insurance Company of Iowa, 8 Cir., 237 F.2d 626, 629; Rasmussen v. Equitable Life Assurance Society of the United States, 293 Mich. 482, 485, 292 N.W. 377; Wozniak v. John Hancock Mutual Life Ins. Co., 288 Mich. 612, 615, 286 N.W. 99.

The parties cite many authorities in support of their respective contentions as to the interpretation of the words "arising from one event or occurrence." However, no case is cited by counsel or found by the court in which the factual situation involved was analogous to that in the present case. In support of its contention that as the damage to the many Whirlpool appliances resulted from one cause, the entire damage constituted "one event or occurrence," plaintiff cites and relies upon Denham v. La Salle-Madison Hotel Co., 7 Cir., 168 F.2d 576, 577. That was an action by the insurers for a declaratory judgment as to the extent of their liability under a policy containing the following provision: "The limit of Underwriters' liability for any one occurrence or catastrophe during the policy period is $10,000 * * * for all loss of and damage to property of any claimant or claimants." A fire had occurred in the La Salle hotel in Chicago, which compelled all guests to leave the hotel in great haste, and they were not permitted to return to their rooms for the purpose of examining and recovering their belongings until about 17 hours after the fire had started. It was then discovered that the property of guests had been damaged by fire, smoke, and water in excess of $30,000 and that guests' property had disappeared, presumably by theft, to the extent of more than $60,000. The insurers contended that the total losses by all guests from fire, smoke, and water and from theft resulted from "one occurrence or catas-

'trophe" and that the insurers' total liability for losses by all guests was limited to $10,000 by the above-quoted policy provision limiting liability. On the other hand, the hotel company contended that the loss of each individual guest constituted a separate "occurrence or catastrophe" and that the policy provided maximum protection of $10,000 as to each guest. In reversing the district court the appellate court held that the fire was the proximate cause of all property losses sustained by guests by fire, smoke or water or by theft, and that all such losses occurring within the period of 17 hours were the result of "one occurrence or catastrophe" and, therefore, that the liability of the insurers under the above-quoted provision was limited to $10,000 for all losses sustained by all guests. In its opinion the court of appeals said at page 583:

"The inescapable inference is that all losses occurred concurrently, that is, within the 17 hour period following the commencement of the fire. It was the fire which created the occasion and furnished the opportunity for thieves to operate. * * *

"Therefore, it is our judgment that all losses designated in this suit were the result of causes acting concurrently and that they must be attributed to the fire as the predominant cause."

The factual situation involved in the La Salle hotel case clearly distinguishes it from the present case, and that decision does not support the plaintiff's contention in the present case.

Counsel for both parties cite and rely upon the case of Arthur A. Johnson Corporation v. Indemnity Insurance Company of North America, 6 A.D.2d 97, 175 N.Y.S.2d 414, 416. In that case the plaintiffs were contractors engaged by the city of New York to extend the platforms of certain subway stations. The work required a trench excavation at subbasement level and the removal of the vaults under the sidewalk in front of two adjoining but separate buildings. The plaintiffs constructed a temporary and entirely separate cinder-block wall at subbasement level to close off the front of each building. After the trench had been dug and the temporary walls constructed, a heavy rainfall caused sewers to overflow and the trench to become filled with water. This water exerted great pressure against the cinder-block walls, and the wall in front of one building collapsed and water flowed into the subbasement, causing damage to the building and the property of the owner and of tenants. About an hour later the wall in front of the other building collapsed and water flowed into the subbasement, causing damage. The owners and tenants of the two buildings asserted claims against the plaintiffs for damage to their property. The policy issued by the defendant insurance company provided a limit of liability for property damage of "$50,000 each accident; $100,000 aggregate operations," and the company refused to indemnify plaintiffs for amounts paid in settlement of all claims in excess of $50,000. Plaintiffs contended that there were two separate accidents, covered by the policy limitation of "$100,000 aggregate operations." Defendant insurance company contended that there was only one accident and that its total liability was limited to $50,000. The trial court held that the action of the plaintiffs in constructing an inadequate cinder-block wall for each building was a separate and distinct act as to each building and gave rise to separate liabilities, and plaintiffs were accordingly awarded judgment for $19,939 paid in settlement of claims in excess of $50,000. In affirming this judgment the New York appellate court said in part:

"The risk was incurred initially when plaintiffs, by opening the vaults of each building, altered the original construction and subjected the basements to exposure. The damage occurred only when the two temporary walls constructed by plaintiffs to protect each of the basements proved unable to withstand the pressures of the elements and

collapsed, allowing the water to reach the goods in each sub-basement with disastrous consequences. Not only were there two separate collapses of walls, resulting in damage to two separate buildings; but the previous actions of the plaintiffs in laying open the vaults of each building and erecting temporary but inadequate walls for each, were distinct and separate acts as to each building which gave rise to separate liabilities. The coincidence that the buildings were adjacent to one another was of no import. Plaintiff undertook separately to take steps for the protection of each building and constructed separate walls at separate times for each. These distinct duties which plaintiff attempted to meet by separate acts of construction created severable liabilities as to each building, once natural forces worked on the weakened barriers to cause damage. Under this view of the facts it would make no difference if the separate walls had collapsed simultaneously or fifty minutes apart, for there were two accidents just as surely as if a single rainstorm had caused the collapse of temporary walls in buildings several blocks apart. * * *

"In the submitted situation the impact upon each building was a separate and single accident, even though several distinct and divisible operations of plaintiffs relating to each building combined to bring about that result. In construing the liability limitations of an insurance policy the number of accidents may be expressed as the number of operative events covered under the policy, which give rise to a series of damaging impacts, either simultaneous or causally connected. If, as here, the acts of the assured are divisible and each results in a separate impact, there is more than one accident.

"Consequently, we find in this case that on August 26, 1947 there was more than one accident and that therefore the liability limitation of $50,000 is not here applicable."

In the Johnson Corporation case the plaintiff contractors had constructed a separate, inadequate cinder-block wall to protect the vault of each building. The walls collapsed about an hour apart from the pressure of rainwater in the trench. The New York appellate court held that the construction of a cinder-block wall for each building was a separate and distinct act as to each building and that the collapse of the two walls about an hour apart, even though caused by a single rainstorm, were separate impacts and that there was more than one accident. In the present case the damage to the Whirlpool appliances, though resulting from a single cause, occurred from time to time and from day to day over a period of about nine months. The factual situation involved and the court's holding in the Johnson case would seem to support the defendant's contention in the present case that the impact upon each cartoned appliance was a separate impact and therefore that there was more than one accident, that is, more than "one event or occurrence."

In support of its contention the plaintiff also cites Barrett v. Iowa National Mutual Insurance Company, 9 Cir., 264 F.2d 224; St. Paul-Mercury Indemnity Company v. Rutland, 5 Cir., 225 F.2d 689; Tri-State Roofing Company v. New Amsterdam Casualty Company, D.C., 139 F.Supp. 193; Truck Insurance Exchange v. Rohde, 49 Wash.2d 465, 303 P.2d 659, 55 A.L.R.2d 1288; Haerens v. Commercial Casualty Ins. Co., 130 Cal.App.2d Supp. 892, 279 P.2d 211. However, the factual situations involved in those cases clearly distinguish them from the present case, and they do not support the plaintiff's contention that the damage from one cause to several thousand separate Whirlpool appliances occurring over a period of about nine months constituted "one event or occurrence."

The word "occurrence" is defined in Webster's New International Dictionary, 2d Ed., as "any incident or event, esp.

one that happens without being designed or expected; as, an unusual *occurrence*." It is therefore clear that the words "event" and "occurrence" as used in the limits-of-liability provision in the policy involved in this action are synonymous. In considering the meaning of the words "each," "a single," "one," "any one," "any" or "an" accident or occurrence, as used in liability policies limiting the insurer's liability, 55 A.L.R.2d 1300, it is stated at page 1304:

"If, on the basis of the present cases, an attempt is made to reconcile the decisions regardless of the rationes decidendi advanced in the respective opinions—simply on the facts presented—such a reconciliation can be achieved on the basis of the closeness of connection in time and space between the individual items of injury or damage. If cause and result are simultaneous or so closely linked in time and space as to be considered by the average person as one event, the courts have invariably found that a single accident within the meaning of the accident clause of the policy has occurred, while if enough time has elapsed between the injuries or damages to the various items involved or if the latter are widely separated in space, the courts have been inclined to allow separate claims even though they sprang from the same cause. Generally speaking, it may therefore be stated that the aggregate of events resulting from insured's negligent act, such as several collisions, constitutes one accident, provided there is a close connection in time and place and a single sequence of cause and effect embracing the entire aggregate of events. If, on the other hand, the times or places and detailed causes of each instance of injury or damage are different, there are separate accidents although each contains a *common causal factor*." (See authorities cited.)

The words "event" and "occurrence" are synonymous and are words of common use and meaning. The phrase "arising from one event or occurrence" in the limits-of-liability provision of the policy here in question is not ambiguous or misleading and was certainly not intended to apply collectively to events or occurrences happening many months apart.

Each of the many Whirlpool appliances that were damaged while stored in plaintiff's warehouse was damaged at a different time during a period of about nine months, and each appliance was damaged by a separate impact of pressure by a carton-clamp assembly. Although the damage to each appliance may have resulted from a single cause, that is, the manner in which the new clamp assembly on the new lift truck was operated, the damage to each appliance was a separate accident and therefore "one event or occurrence" within the meaning of those words as used in the limits-of-liability provision of the defendant's policy.

For the reasons hereinbefore stated the court concludes: (1) That the total damage to the appliances of the Whirlpool Corporation stored in plaintiff's warehouse did not all arise from any "one event or occurrence" within the meaning of those words as used in the limits-of-liability provision of defendant's policy here in question; (2) that the damage to *each* of the appliances of the Whirlpool Corporation stored in plaintiff's warehouse arose from and constituted "one event or occurrence" within the meaning of those words as used in the defendant's policy; (3) that the damage at any one time to any one or two of the Whirlpool appliances stored in plaintiff's warehouse did not exceed the deductible amount of $2,500 as provided in the limits-of-liability provision of defendant's policy; (4) that as all damage to the appliances of the Whirlpool Corporation stored in plaintiff's warehouse did not arise from "one event or occurrence" and as the damage to any one or two of the appliances at the same time did not exceed the deductible amount of $2,500, the defendant is not

legally obligated under its policy to pay such sum as plaintiff may be required to pay the Whirlpool Corporation for damage to its appliances; and (5) that under its policy the defendant is legally obligated to investigate all claims asserted by Whirlpool Corporation and defend the plaintiff in any suit or proceeding that the Whirlpool Corporation may institute against the plaintiff for damages to appliances stored in its warehouse.

A declaratory judgment will be entered in accordance with the foregoing conclusions.

As this opinion sets forth the court's findings of fact and conclusions of law, separate findings and conclusions are not necessary. Rule 52(a), Federal Rules of Civil Procedure as amended, 28 U.S.C.