**MAURICE PINCOFFS CO.**

v.

**ST. PAUL FIRE & MARINE INSURANCE COMPANY and American Home Assurance Company.**

**Civ. A. No. 68–H–518.**

United States District Court,
S. D. Texas,
Houston Division.

Aug. 14, 1970.

James E. Ross, Blades, Crain, Slator & Ross, Houston, Tex., for plaintiff.

Sam Hood, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for defendant St. Paul.

J. P. Forney, Eastham, Watson, Dale & Forney, Houston, Tex., for defendant American Home.

SINGLETON, District Judge.

*Memorandum and Order*

This is an action for a declaratory judgment as authorized by 28 U.S.C. § 2201 (1959). Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332 (1962). The instant case involves construction of a contract of insurance. The parties have submitted the insurance policy in question to the Court for its consideration and have stipulated to the facts involved. This Court shall treat this submission as cross motions for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure.

Plaintiff, Maurice Pincoffs Co., imported a thousand bags of Argentine Canary Seed into the United States. The seed arrived at Houston, Texas, via the S/S NOPAL STAR. The bags of seed were stored in a transit shed at the dock. Over a period of about ten days the bags of seed were sold to eight different seed and feed dealers.

Thereafter, the various dealers sold the seed, either whole or mixed with other grains, to their customers, various bird owners. These bird owners contend that the Argentine Canary Seed which was discharged from the S/S NOPAL STAR was contaminated and had a poisonous effect when fed to birds. Over one hundred bird owners, whose birds have died, have made claims against the dealers from whom they purchased the seed and against plaintiff. The dealers, in turn, have made claims against plaintiff for the claims of their customers. It is claimed that the bags of seed were contaminated with Aldrin, a chemical insecticide.

During the period in question, plaintiff had two policies of liability insurance—one with each of the defendants. The primary policy was the comprehensive general liability policy of defendant St. Paul Fire & Marine Co. (hereinafter referred to as St. Paul). This policy provides limits of liability for "Property Damage—each occurrence $50,000," and for "Property Damage—aggregate $100,-000."

Section III of this policy, entitled "Limits of Liability" provides, in part, as follows:

"Regardless of the number of (1) insureds under this policy (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the Company's liability is limited as follows:"

The Section further provides:

"Coverage B—The total liability of the Company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limits of Property Damage stated in the Declarations as applicable to 'each occurrence'."

It is further provided in the same section of the same policy:

"Coverages A and B—For the purpose of determining the limit of the Company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

In that portion of the policy entitled "Definitions" it is provided:

" '[O]ccurrence' means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the Insured;"

The other liability policy in effect at the time was that issued by the other defendant, American Home Assurance Co. (hereinafter referred to as American). This policy was termed an "Umbrella Liability Policy" and provided coverage for plaintiff's liability after the exhaustion of the underlying limits of insurance provided by St. Paul's policy.

St. Paul contends that under the policy it issued to plaintiff, plaintiff's liability stems from only one occurrence, i. e., the contamination of the bird seed. Thus, according to St. Paul the applicable limit of liability is for "Property Damage—each occurrence $50,000." Consistent with this contention, St. Paul has compromised and settled with forty-six claimants and has paid out a total of fifty thousand dollars. There remain outstanding claims in excess of fifty thousand dollars, which St. Paul contends it is not liable for under its policy. On the other hand, American contends that the one hundred thousand dollar "aggregate" limit of the St. Paul policy applies. Since the underlying policy has not been exhausted, American contends that it is not liable under the insurance policy it issued to plaintiff.

Plaintiff contends that either St. Paul or American is obligated on these claims and asks the Court to determine which one is liable. It is clear that an actual controversy exists between the parties to this action relative to the interpretation of the insurance policy issued by St. Paul. See State Farm Mutual Automobile Ins. Co. v. Mossey, 195 F.2d 56 (7th Cir. 1952); Anchor Casualty Co. v. McCaleb, 178 F.2d 322 (5th Cir. 1949); Denham v. La Salle-Madison Hotel Co., 168 F.2d 576 (7th Cir. 1948); Elston-Richards Storage Co. v. Indemnity Insurance Co., 194 F.Supp. 673 (W.D. Mich. 1960).

In Anchor Casualty Co. v. McCaleb, 178 F.2d 322 (5th Cir. 1949), the insured's oil well blew out and for a period of approximately fifty hours, due to the effect of shifting winds, blew oil on several surrounding properties. An insurance policy was in effect which limited liability to $5,000 for each accident and $25,000 for aggregate damage. In holding that the aggregate limits applied, the United States Court of Appeals for the Fifth Circuit said:

"The blowing-out of the well was not a single accident but a series of events, a catastrophe. Numerous accidents were the product of this motivating force and the wind as a supervening force. The eruptions continued intermittently for over two days; and during this period the wind changed from time to time, blowing mud and sand on different properties. The wording 'each accident,' as used in the policy, must be construed from the point of view of the person whose property was injured. In Bouvier's Law Dictionary, an accident is defined as an event which, in the circumstances, 'is unusual and unexpected by the person to whom it happens.' When the separate property of each claimant was damaged, an accident occurred to the property of each owner. If one cause operates upon several at one time, it cannot be regarded as a single incident, but the injury to each individual is a separate accident." 178 F.2d at 324–325.

In St. Paul-Mercury Indemnity Co. v. Rutland, 225 F.2d 689 (5th Cir. 1955),

the Fifth Circuit was again called upon to construe the phrase "each accident." In *Rutland*, the insured's truck collided with a freight train causing the derailment of sixteen cars. The railroad cars belonged to fourteen separate owners. The insurance policy on the truck provided coverage in the amount of $5,000 for each accident. The policy did not specify any limit for aggregate damage to property resulting from the truck collision. The damages far exceeded $5,000. The insured contended that there was a separate accident as to each owner of property damaged in the collision and that the insurer was legally liable to pay up to the sum of $5,000 to each owner whose property was damaged.

In ruling that the collision constituted only one accident, the Court said:

"Considering only the policy involved here without reference to previous judicial interpretations, we think it clear that the word 'accident' as used in the disputed phrase was intended to be construed from the point of view of the cause rather than the effect. Hence, unless the doctrine of stare decisis requires another interpretation, the limit of appellant's liability would be $5,000 since all property damage occurred in the single, sudden and unintentional collision." 225 F.2d at 692.

And then the Court went on to distinguish *Rutland* from the previous decision handed down in *Anchor*. The *Rutland* Court emphasized the fact that in *Anchor* the oil was spread on surrounding property through the action of the shifting wind. Thus, the Court reasoned, *Anchor* involved a series of events, whereas Rutland involved a single, sudden collision.[1] In addition, the Court acknowledged that the insurance policy in *Anchor* provided for aggregate coverage, whereas the policy in *Rutland* had no such provision. To apply the *Anchor* rationale to the insurance policy in *Rutland* would result in virtually unlimited liability for the insuror. Thus, the *Rutland* Court ignored the language in *Anchor* which spoke of an accident occurring to the property of each owner when that property was damaged.

Other cases have also considered the question posed by the present case. See Barrett v. Iowa National Mutual Ins. Co., 264 F.2d 224 (9th Cir. 1959); Denham v. La Salle-Madison Hotel Co., 168 F.2d 576 (7th Cir.), cert. denied, 335 U. S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948); Elston-Richards Storage Co. v. Indemnity Insurance Co., 194 F.Supp. 673 (W.D.Mich.1960); Tri-State Roofing Co. v. New Amsterdam Casualty Co., 139 F.Supp. 193 (W.D.Pa.1955); Allied Grand Doll Mfg. Co. v. Globe Indemnity Co., 15 A.D.2d 901, 225 N.Y.S.2d 595 (1962).

In *Barrett*, the insured's building caught fire and was destroyed, as was the personal property of seven tenants who leased portions of the building. Without much discussion, the Court noted that there was but one fire and that it constituted a single accident within the meaning of the insurance policy.

In *La Salle-Madison*, the insured's hotel caught fire, requiring that it be evacuated for a period of seventeen hours. Upon returning to the hotel, approximately 250 guests discovered that their belongings had either been damaged by fire or water or had disappeared. The insurance policy provided

---

1. The dissent in *Rutland* disagreed vigorously with the efforts of the majority to distinguish *Anchor*.

"Now where does the wind come in? Does the majority intend to accept the thesis that, if the wind continued to blow from one direction only, sometimes harder than at others, Anchor would have been liable only for the $5,000.00 limit; and does the reasoning go a step further and accept the premise that, if the wind changed five times and damaged five people at separate times, each to the extent of $5,000.00, Anchor would be liable for $25,000.00? Does the fortuitous shifting of the wind alter the contractual obligations assumed by Anchor and arising from the single event of the blowing out of the well? 225 F.2d at 702 (dissent).

for a $10,000 limit of liability "for any one occurrence or catastrophe." The Court held that the theft losses were attributable to the situation brought about by the fire. Thus, all losses were a result of causes acting concurrently and were the result of "one occurrence or catastrophe." Significantly, the insurance policy in question provided that the amount of the insurance coverage would be reduced by the amount of any payment under the policy. It was further provided that the full amount of the policy would be immediately reinstated to apply to subsequent losses. In effect, at any one time the insuror's liability was only $10,000. Since the Court ruled that the losses were concurrent, the insuror's liability was limited to $10,000 regardless of whether the losses are viewed as having resulted from one occurrence or from more than one occurrence.

In *Tri-State Roofing,* the insured's employee overturned a tar pot causing an extensive fire that destroyed eleven different properties. The Court in its original opinion held that the "aggregate" limit of liability applied, not that for "each accident." However, the Court's opinion was based in great part upon an unpublished opinion from the Fifth Circuit in the *Rutland* case. That opinion was withdrawn and another panel issued the new *Rutland* opinion, which was discussed earlier. On motion for rehearing the Court in *Tri-State Roofing* summarily reversed itself on the basis of the new *Rutland* opinion, illustrating the problematic nature of this question of law.

In the *Allied Grand Doll* case, a faucet on the premises of the insured was left running over a weekend. The water damaged the property of other businesses on lower floors of the same building. In holding that the limit of liability for each accident, rather than aggregate limits were applicable, the Court said:

"These were not separable events, but flowed from one continuous cause, a single fault, i. e., the leaving on of a faucet * * * Diversion of the flow or its division into streamlets, so

long as it remained continuous and not interrupted by other independent cause, will not change the nature of the occurrence. There was a single accident with separate consequences." 225 N.Y.S.2d at 596.

In another case, Arthur A. Johnson Corp. v. Indemnity Ins. Co. of North America, 6 A.D.2d 97, 175 N.Y.S.2d 414 (1958), the insured was making excavations for the extension of subway station platforms. The insured constructed cinder-block walls to protect the basements of buildings adjoining the excavation. After a rainstorm, two of the walls collapsed causing damage to the property in two separate, but adjoining buildings. In holding that the aggregate limits of liability applied, the Court said:

"The risk was incurred initially when plaintiffs, by opening the vaults of each building, altered the original construction and subjected the basements to exposure. The damage occurred only when the two temporary walls constructed by plaintiffs to protect each of the basements proved unable to withstand the pressures of the elements and collapsed, allowing the water to reach the goods in each sub-basement with disastrous consequences. Not only were there two separate collapses of walls, resulting in damage to two separate buildings; but the previous actions of the plaintiffs in laying open the vaults of each building and erecting temporary but inadequate walls for each, were distinct and separate acts as to each building which gave rise to separate liabilities. * * * These distinct duties which plaintiff attempted to meet by separate acts of construction created severable liabilities as to each building, once natural forces worked on the weakened barriers to cause damage. * * *"

In Elston-Richards Storage Co. v. Indemnity Insurance Co. of North America, 194 F.Supp. 673 (W.D.Mich.1960), numerous large appliances were damaged over a period of nine months by a defective lift truck used in the insured's

warehouse. The insurance policy in question provided a $2,500 deductible for each occurrence. In ruling that the insured's damage resulted from numerous separate accidents, the Court said:

> "Each of the many Whirlpool appliances that were damaged while stored in plaintiff's warehouse was damaged at a different time during a period of about nine months, and each appliance was damaged by a separate impact of pressure by a carton-clamp assembly. Although the damage to each appliance may have resulted from a single cause, that is, the manner in which the new lift truck was operated, the damage to each appliance was a separate accident and therefore 'one event of occurrence' within the meaning of those words as used in the limits-of-liability provision of the defendant's policy." 194 F.Supp. at 682.

The majority of cases have taken the view that the Court will look to the cause of the accident rather than to the effects to determine if there has been one accident or more than one accident. St. Paul contends that there is but one cause of the damages for which plaintiff is liable—the contaminated birdseed. The fact that the birdseed has caused damage to many different people in various places does not mean that there was more than one "accident or occurrence." St. Paul likens the present case to the *Allied Grand Doll* case in which the faucet was left running. There was but one cause of the damage—the running faucet, even though the water divided into different streamlets to cause the damage. Thus, contends St. Paul, the contaminated seed was the one cause. They have been divided into streamlets by plaintiff's sale of them to different people, but there remains one cause and only one "occurrence," under the terms of the policy.

To further bolster its argument, St. Paul points to the provisions of its policy which provide that the limits of liability are not affected by the number of persons injured. Whether there was one or more accidents is not determined from the standpoint of the persons injured. Thus, the policy provisions provide for a different approach from that in the *Anchor* case, which said that "the wording 'each accident' * * * must be construed from the point of view of the person whose property was injured." In addition, St. Paul points to policy provisions which provide that "all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." St. Paul contends that the facts of the present case fall within this provision of the policy. Thus, an accident or occurrence, under the provisions of the St. Paul policy, is more than a "single, sudden and unintentional" event as suggested by the Rutland opinion.[2]

---

2. It is appropriate at this point to note that we are construing a contract of insurance and to the extent that they are unambiguous the terms of that contract govern the determination of the applicable liability limits. The following quoted material provides a summary of Texas law on the construction of insurance contracts:

> "Since insurance policies are contracts, they are governed by the rules of interpretation that are applicable to contracts generally and this notwithstanding the rule that contracts of insurance are to be strictly construed in favor of the insured. * * * Courts may only construe a contract of insurance as it was made; they are not authorized

to make a new contract for the parties. * * * If words used in an insurance policy are plain and unambiguous, it is the court's duty to give effect to that language in accordance with its plain, ordinary meaning, and not create a new contract by arbitrary judicial construction. * * *" Fruhman v. Nawcas Benevolent Auxiliary, 436 S.W.2d 912, 915 (Tex.Civ.App.—Dallas 1969, error ref'd. n. r. e.) (Citations omitted.)
Where a policy of insurance uses terms of doubtful meaning or where the language of the contract is ambiguous, that insurance contract is to be strictly construed in favor of the insured and against the insurer. Royal Indemnity Co. v. Marshall, 388 S.W.2d 176 (Tex.1965).

A review of the cases discussed earlier reveals a great variety of factual settings and, in particular, a variety of policy provisions. To one extent or another, each case is distinguishable from the one presently before the Court. The rationales of the various decisions conflict with one another. However, relying only on their factual context, it is possible to categorize the cases. The cases which have held that the facts constituted only one accident all involved one cause which through a natural sequence of events resulted in damage to different properties. In each of these cases the cause and its effects were closely related in time and space, and there were no intervening causes. E. g., Barrett v. Iowa National Mutual Ins. Co., *supra*; St. Paul-Mercury Indemnity Co. v. Rutland, *supra*; Tri-State Roofing Co. v. New Amsterdam Casualty Co., *supra*; Allied Grand Doll Mfg. Co. v. Globe Indemnity Co., *supra*. The cases which have held that the facts constituted more than one accident or occurrence involve situations where, although there is a common causal factor, there is either an intervening cause, e. g., Anchor Casualty Co. v. McCaleb, *supra* (the wind); Arthur A. Johnson Corp. v. Indemnity Ins. Co. of North America, *supra* (the two separate but negligently constructed walls), or the cause and its effects are widely separated either in time or space, e. g., Elston-Richards Storage Co. v. Indemnity Insurance Co., *supra*. (Although the defective lift truck was a common cause, the effects of its use were spread over a nine-month period.)

▪ While the above analysis does not explain all of the cases,[3] it provides a sufficient guide for the resolution of the present case. There was but one cause of the damage in this case. There was no intervening cause. The birds died as a result of consuming contaminated birdseed. Thus, the cause of the damage was the contaminated birdseed. All of the birdseed was from the same batch of seed. It all arrived on the same ship and was stored in the same storage shed. There is no evidence that there were multiple incidents of contamination. The Court must conclude that the contamination was the result of one occurrence. Accordingly, the damage to the various birdseed dealers and bird owners arose out of one occurrence and the limits of the St. Paul policy applicable to "each occurrence" is invoked by the facts of this case. Therefore, St. Paul is liable only up to the amount of $50,000 and American Home Assurance Company is liable under the terms of its policy for any damages in excess of $50,000 not to exceed the stated limits of its policy.

For the reasons given above, a declaratory judgment should be entered reflecting that with regard to St. Paul Fire & Marine Insurance Company policy number 542 AG 8318, the limit of liability for each occurrence ($50,000.00) is applicable, and that American Home Assurance Company's policy number CE 35-04-02 is applicable to any damages in excess of $50,000.00 up to the limits of said policy.

The Clerk will notify plaintiff's attorney to prepare an appropriate judgment in accordance with this memorandum and Order for submission to the Court by September 15, 1970, after first obtaining approval of counsel for St. Paul and counsel for American as to form.

---

3. The case of Denham v. La Salle-Madison Hotel Co., 168 F.2d 576 (7th Cir.), cert. denied, 335 U.S. 871, 69 S.Ct. 167, 93 L.Ed. 415 (1948), may not fit this analysis. This case is more appropriately explained in terms of the peculiarities of the provisions of the policy in effect. See discussion in text, *supra*.