680 A.2d 1082

**CSX TRANSPORTATION, INC. et al.**

**v.**

**CONTINENTAL INSURANCE COMPANY et al.**

**No. 49, Sept. Term, 1994.**

Court of Appeals of Maryland.

Aug. 7, 1996.

Joseph D. Tydings (Michael A. Nardolilli, Lee M. Straus, Anderson Kill Olick & Oshinsky, Washington, DC; Stephen B. Caplis, Lisa A. Lett, Whiteford, Taylor & Preston, Baltimore; R. Templeton Fitch, Jacksonville, FL, all on brief), for Appellants.

James E. Gray (Linda S. Woolf, Goodell, DeVries, Leech & Gray, Baltimore; Stephen A. Cozen, Thomas G. Wilkinson, James E. Brown, Cozen and O'Connor, Philadelphia, PA, on brief) (James E. Rocap, III, Cathy J. Burdette, J. Bradley Bennett, Miller, Cassidy, Larroca & Lewin; Roger W. Yoerges, Denise Esposito, Wilmer, Cutler & Pickering, Washington, DC, on brief), for Appellees.

W. Fain Rutherford, Frank K. Friedman, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA; Stephen A. Trimble, Patrick Kavanaugh, Hamilton & Hamilton, Washington, DC, for Amicus Curiae, Norfolk Southern Corporation.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (retired), Specially assigned.

BELL, Judge.

This appeal had its genesis in an action for declaratory judgment to resolve a coverage dispute with CSX Transportation, Inc. ("CSXT"), filed in the Circuit Court for Baltimore County by several insurance companies. At the center of the coverage controversy was what constitutes "an occurrence" and the number of occurrences giving rise to the noise induced hearing loss ("NIHL") suffered by past and present employees of CSXT's predecessor railroads. After trial, pursuant to special jury verdicts, the trial court entered judgment in favor of the insurers. The court declared that, because the subject excess liability insurance policies do not provide coverage, the payments CSXT made with respect to the NIHL claims made against it were not reimbursable. We granted certiorari, on our own motion, prior to consideration of CSXT's appeal by the Court of Special Appeals. The issues on this appeal are the propriety of certain instructions the trial court gave the jury, whether various trial instructions requested by CSXT should have been given, and the correctness of the trial court's grant of partial summary judgment in favor of some of the insurers on the issue of whether NIHL is an occupational disease.

## I.

Harbor Insurance Company and Pacific Insurance Company[1], the appellees, filed, in the Circuit Court for Baltimore County, a complaint seeking declaratory relief against a number of railroads that, over the years, and up to and including 1986, had purchased excess liability insurance from them. Through a series of mergers and acquisitions, the policyholder railroads now comprise CSXT, which has acquired the assets of the railroads and assumed their liabilities, including the NIHL claims at issue. They joined in the action other insurance carriers from whom the railroads had purchased

---

1. Harbor Insurance Company and Pacific Insurance Company were subsequently acquired by Continental Insurance Company, which thereupon became the real party in interest.

additional excess liability coverage. The declaration the appellees sought was a determination of the amount of excess liability coverage that was available to the railroads for long-term NIHL claims their present and former employees had asserted under the Federal Employers' Liability Act ("FELA").[2] CSXT filed cross-claims and counterclaims for declaratory and supplementary relief.

The appellees asked the trial court to declare that each employee's NIHL claim arose from a separate occurrence, that, from the standpoint of each insurance policy, the thousands of NIHL claims were separate and individual and, hence, necessarily arose from multiple occurrences. For its part, CSXT asked the trial court to declare that CSXT, as the successor to the individual railroads, was entitled to be reimbursed for what it had already paid in resolution of the NIHL claims. Contrary to the appellees' position, CSXT urged that the NIHL claims filed against a policyholder railroad constitute but one occurrence for purposes of the applicable excess liability policies, all such claims having resulted from two "common causes": the claimants' exposure to hazardous noise and the failure of the policyholder railroads to mandate system-wide hearing protection,[3] which would have prevented the hazardous exposure.

At the heart of this case are 246 insurance policies purchased by CSXT's predecessors. Each policy contained a self-insured retention ("SIR") feature,[4] under which the policyhold-

---

2. See 45 U.S.C. § 51, et seq. (1994). *See also Dixon v. CSX Transportation, Inc.,* 990 F.2d 1440, 1442 (4th Cir.1993), *cert. denied,* 510 U.S. 915, 114 S.Ct. 305, 126 L.Ed.2d 252 (1993), indicating that FELA is the federal compensation remedy for railroad workers.

3. CSXT argues that ten policyholders, itself included, originally purchased the excess liability policies at issue in this case. It maintains, therefore, that there are only ten separate occurrences, one for each policyholder and that policyholder's railroad system.

4. In Harvey W. Rubin, *Dictionary On Insurance Terms* 292 (2d ed.1991), self-insured retention (SIR) is defined as:

portion of a property or liability loss retained by a policyholder. Most policyholders do not purchase insurance to cover their entire

er agreed to self-insure a portion of the liability for each occurrence; the coverage provided by the policy does not become effective until the agreed upon SIR limit is reached. In other words, each railroad agreed to assume responsibility for both the defense and indemnity of claims up to a certain dollar amount before the insurance company's obligation in that regard took effect. The SIR limits on the policies *sub judice* ranged from $100,000 to $3 million dollars. Pursuant to the applicable excess liability policies, the appellees are obligated to indemnify their insureds for "all sums" that the insureds become obligated to pay "because of personal injury or property damage caused by an occurrence." This obligation includes third-party claims, such as FELA actions filed by the railroads' employees. Personal injury under the policies includes "bodily injury, mental anguish, shock, sickness or disease." Some policies contained an aggregate limit for occupational diseases. Those policies restricted the amount of recovery for such liability to a stated amount, no matter how many occurrences there may have been. Certain policies also contained a "cessation from work" clause, pursuant to which a claimant could recover only if he or she had stopped work during the policy period.

Although not all do so, many of the policies define "occurrence." Most of the policies that define occurrence describe it as "an accident, including continuous or repeated exposure to

---

exposure. Rather, they elect to take a deductible, or portion that they will cover themselves. For example, a homeowner may purchase $150,000 worth of insurance with a $500 deductible for certain losses, such as roof damage by hail. The $500 deductible is one form of self insurance. It means the homeowner will cover all losses for that amount or less.

The same work defines self-insurance as:

protecting against loss by setting aside one's own money. This can be done on a mathematical basis by establishing a separate fund into which funds are deposited on a periodic basis. Through self insurance it is possible to protect against high *FREQUENCY low-severity* losses. To do this through an insurance company would mean having to pay a premium that includes loadings for the company's general expenses, cost of putting the policy on the books, acquisition expenses, premium taxes, and contingencies.

*Id.*

conditions, which result in personal injury or property damage neither expected or [sic] intended from the standpoint of the insured." Other policies define "occurrence" as "one or more accidents or series of accidents arising out of or resulting from one event." Still others define it to mean "(a) [a]n accident, or (b) [a] continuous or repeated exposure to conditions which result in personal injury or property damage which is neither expected nor intended from the standpoint of the Insured."[5] In addition, many of the policies contain a "Limits of Liability" section, which provides, in pertinent part:

> For the purpose of determining the limit of [the insurance company's] liability, all personal injury ... arising out of continuous or repeated exposure to substantially the same general condition existing at or emanating from one location or source shall be considered as arising out of one occurrence.

Like CSXT, we shall refer to this portion of that section as the "one occurrence clause."

Certain factual issues, namely, what constitutes an occurrence under the various insurance policies and the number of occurrences were tried to a jury. Having the burden of proof, CSXT offered evidence tending to prove its allegations and the insurers cross-examined the witnesses it presented. At the conclusion of CSXT's case, the insurers elected not to present a case.

CSXT agrees with the insurers that, in defining "occurrence" under the policies, the appropriate focus is on the cause of the worker's injury; that means, in the words of some of the policies, the "event" out of which the accident or series of accidents arose or resulted. CSXT does not agree with the insurers, however, as to what that cause was. Rather, CSXT believes that NIHL resulted not only from the unprotected exposure to hazardous noise, but also from the failure of each

---

**5.** Because a number of the policies defined "occurrence" in terms of an "accident," or series of accidents, a sub-issue in this case was whether the exposure of a worker to hazardous noise, over time, was "an accident" as used in the various policies and as commonly understood.

policyholder management group to mandate hearing protection. The evidence it presented was designed to substantiate that proposition.

It was for this reason that CSXT produced testimony concerning the history of NIHL claims. Its witnesses placed the start of what CSXT terms "a tidal wave of NIHL claims" in 1988. Before that time, they testified, CSXT, and the predecessor railroads, had experienced only thirteen such claims. CSXT also offered evidence concerning the pervasiveness of noise in the railroad industry. Witnesses testified that the NIHL claims CSXT's predecessor railroads received derived from the various crafts in the different parts of the railroads. Indeed, CSXT presented testimony that hazardous noise is inherent in a railroad's three principal operating departments: transportation, which moves freight on the rail system; engineering, which is responsible for the maintenance of the tracks and roadbeds; and mechanical, which has responsibility for maintaining a system's equipment in its various shops and yards. Hazardous noise could not be eliminated from these operations, the witnesses for CSXT testified, either by removing the noisy machines or reducing the level of noise.

CSXT offered evidence to substantiate its belief that it is impossible to pinpoint, with any specificity, the precise location, or locations, at which a particular NIHL claimant was exposed to hazardous noise. CSXT witness, Dr. Joseph Sataloff, one of the foremost experts on NIHL and its prevention,[6] explained how NIHL develops. He said that it is caused by the unprotected exposure to hazardous noise over time. Hazardous noise, he said, is noise which exceeds 90 decibels over an eight hour work day. Such noise produces "very strong pressure waves that go through the air . . . [and] hit the hair

_____

6. Dr. Sataloff is an otologist and a Professor of Otolaryngology at Jefferson Medical College in Philadelphia. He has written several textbooks and numerous articles on occupational hearing loss and its prevention. *See, e.g.,* R. Sataloff & J. Sataloff, *Occupational Hearing Loss* (2d ed.1993).

cells [of the inner ear] ... [and] damage ... the hair cells...." More specifically, he explained:

> When these hair cells are damaged, first it is temporary. Like you shoot a gun, you have hearing loss and it clears up the next week. After awhile it gets permanent. So if you have habitual exposure, day in and day out to repetitive injury from a loud noise from work or gun shooting, the hair cells become permanently damaged and at the present time we have no cure for it.

Because the damage to the hair cells is caused by pressure waves hitting them, Dr. Sataloff testified that NIHL will occur whatever the source or origin of the noise:

> Well, as I said, noise is noise. It doesn't matter which machine produces it, it is the same pressure waves and they always damage the inner ear, always the hair cells and the initial damage always shows as [sic] the three, four, five thousand cycles. So it doesn't matter if it is from a jet airplane, from a gun, from a compressor, from a vacuum cleaner, the first damage, no matter what the sound is, if it is loud enough to cause damage[,] is characteristically the four thousand cycle dip.

Because there is hazardous noise throughout a railroad's operations, and NIHL occurs over time, *i.e.* after ten to fifteen years of exposure, CSXT's evidence tended to show, and it argued, that a particular claimant's NIHL cannot be attributed to a particular piece of noisy equipment. This is so, it maintained, because, given the mobility of some noisy equipment, and the fact that more than sixty percent of the NIHL claimants worked in more than one of the principal operations departments of the railroads, particularly the transportation and engineering departments, a claimant may have been exposed to many pieces of noisy equipment over the time necessary for NIHL to develop.

CSXT hoped to prove that the cause of the subject NIHL was the railroads' failure to mandate protection from hazardous noise, the only means of preventing NIHL. Proceeding from the premises that noise is inherent in railroad operations

and that it is impossible to identify the noise source of NIHL—*i.e.* a particular noise emitted by a particular piece of machinery—it reasons, as Dr. Sataloff stated, that "the only way to solve ... [NIHL] immediately was with hearing protectors[;]" prevention is only possible if the mandatory wearing of hearing protectors is required. Consistently, CSXT's Director of Industrial Hygiene opined that noise from noisy locomotives is not hazardous when the workers wear hearing protection. CSXT pointed out that neither it, nor its predecessor railroads, mandated hearing protection in the 1980's. It sought to correct that omission, the evidence suggested, by conducting noise exposure experiments and then adopting, from time to time, recommendations for expanding the scope of mandatory hearing protection.

At the conclusion of the evidence, the court instructed the jury with respect to the issues it was to decide. In pertinent part, the court instructed:

> You are instructed that a self-insured retention or SIR is that portion of a liability loss that is retained by a policyholder. In other words, an SIR is a form of self-insurance through which a policyholder protects against loss by setting aside its own money.

> The purpose of self-insurance of this type is to protect against high frequency, low severity losses, without incurring the additional premium expense that a policyholder would pay to an insurance company that would reflect the company's general expenses associated with handling such high frequency, low severity losses.

> * * *

> As I instructed you at the beginning of this trial, the sole questions you would be asked to determine are whether there have been occurrences as defined in the excess liability insurance policies at issue, and if so, the number of occurrences which have taken place.

> An occurrence, under an excess liability insurance policy, must meet the definition of occurrence in the policy and be

determined [to be] the proximate cause of the injuries or damages at issue.

Many things can be said to cause injury, but for you to determine what the occurrence is in this case, the law requires that you determine what the proximate cause was of the noise-induced hearing loss claims.

Proximate cause in this sense is the cause which is nearest in the order of responsible causation to the resulting injuries, the cause which, in a natural and continuous sequence, unbroken by any efficient intervening cause, logically and probably produces the injury.

As you have heard, it is the position of CSXT that the occurrence and the proximate cause of all of the NIHL claims is the failure of CSXT and its various predecessor railroads to mandate hearing protection for its employees.

It is the position of the insurers, on the other hand, that the proximate cause of each claim is the conditions of hazardous noise levels to which a railroad worker was exposed, that resulted in noise-induced hearing loss to that worker.

\* \* \*

You are instructed that the term accident, in a liability policy, is to be given its ordinary meaning, which is a sudden, unusual event, not under the control of the insured, which takes place at a particular point in time and gives rise to a loss.[7]

Certain of the excess liability policies, purchased by the predecessor railroads, provide that, under certain circumstances, a number of separate claims for injury or damage may be aggregated. That is, combined and treated as a single occurrence.

---

7. As a predicate to this instruction, the trial court noted that the policies contained different definitions of "occurrence," some referring to "accident" or "series of accidents." The jury was instructed that its determination of whether there was an "occurrence" and what constituted an occurrence was to be made by reference to the actual policy language.

The policy provision, that specifies the circumstances under which separate occurrences may be combined, reads as follows: For the purpose of determining the limit of the company's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same condition existing at or emanating from one location or source shall be considered as arising out of one occurrence.

You have heard this language referred to on occasion as the location or source language. Under this language, if you find that the preponderance of the evidence proves that NIHL claims arose out of substantially the same general conditions existing at a particular location or emanated from a particular source, then you may treat all of the NIHL claims resulting from the continuous or repeated exposure to that source or location as one occurrence.

On the other hand, if the evidence fails to demonstrate the claimants were exposed to substantially the same general condition existing at particular locations or emanating from particular sources, then you need not treat multiple NIHL claims as one occurrence.

For the most part, the court had adopted the insurers' requested instruction.

The jury also was instructed that CSXT had the burden of proof with respect to both the meaning of "occurrence" and the number of occurrences. To assist it in announcing its findings, the jury was given the following special written interrogatory:

1. Some of the excess liability policies in this case define "occurrence" as an "accident" or "series of accidents arising out of or resulting from one event." Do you find that the railroad defendants have proved that the occupational hearing losses at issue are "accidents" or "series of accidents" under these policies:

[ ] Yes     [ ] No

2. Do you find that the "occurrence", as that term is defined in various excess liability insurance policies, that

caused the noise-induced hearing losses allegedly sustained by railroad employees was: [check one only]

A.   the failure by each railroad management to mandate the use of hearing protection by employees, as contended by CSXT?

or

B.   each NIHL claimant's continuous or repeated exposures to conditions of excessive occupational noise, as contended by the Insurers?   *If your Answer to Question No. 2 is "A", goon to answer the Question No. 3.*

*If your answer to Question No. 2 is "B", then skip the next question and proceed to answer Question No. 4.*

3.   Based upon the evidence presented to you, if you find that the occurrence is the failure by each railroad management to mandate hearing protection, how many such failures do you find?

Answer:_____

*If your answer to Question No. 2 is "A" and you filled in a number in response to Question No. 3, then skip the remaining question and sign and date this verdict form.   If your answer to Question No. 2 is "B", then answer Question No. 4.*

4.   Based upon the evidence presented to you, if you find that the occurrence was each NIHL claimant's continuous or repeated exposure to conditions of excessive occupational noise, what do you find is the minimum number occurrences?

Answer:_____

Finding the insurers' view of "occurrence" to be persuasive, the jury returned a verdict in favor of the appellees.   It determined that there were a minimum of 20,235 separate occurrences.   It also found that CSXT failed to prove "that the occupational hearing losses at issue are 'accidents' or 'series of accidents' under these policies."   Having previously decided by grant of partial summary judgment in favor of the

insurers, that NIHL is an occupational disease,[8] the trial court entered final judgment declaring that the insurers were under no obligation to indemnify CSXT for the settlement of the NIHL claims. It also entered judgment in favor of the insurers with respect to CSXT's counter-claims and cross-claims. From these judgments, CSXT has noted its appeal.

## II.

The instructions given the jury in this case make quite clear that the test for determining whether an occurrence has taken

---

**8.** Whether NIHL is an occupational disease, or not, is relevant with regard to policies with occupational disease aggregate limits—those in which a single, specified "aggregate" amount of liability is provided for occupational diseases, different from that for other injuries. Some of the policies contained both an occurrence limit and an aggregate limit for occupational diseases. Those policies define the limits of liability largely as follows:

Regardless of the number of persons or organizations who may claim indemnity under this policy as insureds, The Company's liability for ultimate net loss because of personal injury and property damage resulting from any one occurrence shall then be limited to the amount stated in Section 1.5 as "Occurrence Limit—Personal Injury and Property Damage"; provided however that the Company's liability shall be further limited to the amount stated in Section 1.6 [Aggregate Limit: (Occupational diseases)] with respect to all ultimate net loss because of personal injury which occurs during each annual period while this policy is in force commencing from its effective date, and which arises out of occupational diseases of employees of the Insured.

Under those policies, therefore, there is one limit that applies to each occurrence, not involving occupational diseases, resulting in personal injury or property damage and another that applies to all occupational diseases, occurring during the policy year. The latter limit further reduces the insurers' exposure because it does not apply to each occurrence of an occupational disease, rather it applies collectively to *all* occurrences of occupational disease. Where, for example, the aggregate limit for occupational diseases is $1 million, the insurers' liability for occupational diseases cannot exceed that amount, no matter how many such covered occurrences there may be.

Determining whether physical injury is a result of bodily injury or occupational disease is a preliminary or threshold issue, the resolution of which has implications for the insurer's ultimate liability. Because the SIR applies to occupational diseases as well as bodily injury, the nature of the injury, and its impact on liability, become relevant only when that threshold is reached, when it has been determined that the injury is a covered injury.

place takes into account the cause of the resulting claims or injuries, a proposition with which CSXT is not in disagreement. The instructions were explicit in that regard; they required the jury to determine what the proximate cause of the NIHL claims was. Proximate cause was defined, by the instructions, in a manner consistent with the definition given that term by the appellate courts of this State. *See Hartford Insurance Co. v. Manor Inn*, 335 Md. 135, 154–157, 642 A.2d 219, 229–230 (1994); *Atlantic Mutual Insurance Co. v. Kenney*, 323 Md. 116, 127, 591 A.2d 507, 512 (1991) (to be proximate, the cause of the injury "must be (1) a cause in fact, and (2) a legally cognizable cause"); *Scott v. Watson*, 278 Md. 160, 173, 359 A.2d 548, 556 (1976) ("if the situation wrongfully created by the defendant increased the risk of damage through the operation of another reasonably foreseeable force, the defendant is liable for the ensuing loss.") (quoting *Little v. Woodall*, 244 Md. 620, 626, 224 A.2d 852, 855 (1966)); *Bloom v. Good Humor Ice Cream Company*, 179 Md. 384, 387, 18 A.2d 592, 593–94 (1941) ("the natural and probable consequence of the negligent act, unbroken by any intervening agency, and where the negligence of any one person is merely passive, and potential, while the negligence of another is the moving and effective cause of the injury, the latter is the proximate cause and fixes the liability."); *Marlow v. Cerino*, 19 Md.App. 619, 631, 313 A.2d 505, 512 (1974) ("proximate cause is the cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces a condition that is ... the condition without which the results would not have occurred."). *See also* Restatement (Second) of Torts § 435.[9]

---

**9.** Section 435 provides:

Foreseeability of Harm or Manner of Its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

CSXT does not challenge directly the accuracy of the proximate cause instruction given; indeed, it acknowledges that the jury was instructed to "evaluate proximate causation 'to determine what the occurrence is in this case.'" Focusing on what the trial court did not instruct, CSXT takes issue with the failure of the instruction explicitly to mention causation when discussing the jury's responsibility to determine the number of occurrences or expressly to inform the jury that "claims resulting from a common cause form one occurrence." It is to this latter complaint that CSXT devotes most of its attention.

CSXT proposed that the jury be told:

Injuries that result from a common cause constitute one occurrence, even if there are differences among the injuries. These differences may include, among others, variations in the timing, location and severity of the injuries. These differences do not mean that the injuries result from more than one occurrence, so long as the injuries result from a common cause.

It now contends that the court's refusal to propound that instruction, in light of the fact that it was supported by overwhelming evidence, was prejudicial error. It argues that this omission, when coupled with an instruction, proposed by the insurers, advising the jury that the subject excess liability insurance policies did not protect against "high frequency, low severity losses," "preordained a verdict against CSXT." In addition, CSXT decries the court's refusal to instruct the jury that a failure to act may be the proximate cause of an injury,[10] or that an injury may result from multiple causes.[11]

---

**10.** CSXT's proposed instruction 22 provided:

A failure to act may cause an injury. Where multiple injuries are caused by the same failure to act, the injuries result from one occurrence. If you find a failure to act by each policyholder, that failure to act may be a separate occurrence.

**11.** CSXT's proposed instruction 19, based on Maryland Civil Pattern Jury Instruction 19:10, read:

For the railroad employees to recover damages, the negligence of the railroads must have been a cause of an injury. There may be more than one cause of an injury, that is, several negligent acts may work

## III.

### A.

For purposes of applying their per occurrence limits, "occurrence," as used in the policies under review, may be viewed in three ways. *See generally What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability To a Specified Amount Per Accident or Occurrence,* 64 A.L.R. 4th 668 (1988). By far the vast majority of courts that have considered the issue view it from the perspective of causation, "by referring to the cause or causes of the damage [or injury] and not to the number of injuries or claims." *Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 379 (6th Cir.1984). *See Babcock & Wilcox Co. v. Arkwright–Boston Manufacturing Mutual Insurance Co.,* 53 F.3d 762, 767–68 (6th Cir.1995), *reh'g en banc denied, cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996); *Mead Reinsurance v. Granite State Insurance Co.,* 873 F.2d 1185, 1188 (9th Cir.1988); *Business Interiors, Inc. v. Aetna Casualty & Surety Co.,* 751 F.2d 361, 363 (10th Cir.1984); *Home Indemnity Co. v. City of Mobile,* 749 F.2d 659, 662–63 (11th Cir.1984); *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.,* 676 F.2d 56, 61 (3d Cir.1982); *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502, 505–06 (2nd Cir.1976), *cert. denied,* 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Insurance Co.,* 447 F.2d 204, 206–07 (5th Cir.1971); *St. Paul–Mercury Indemnity Company v. Rutland,* 225 F.2d 689, 692 (5th Cir.1955); *Chemstar, Inc. v. Liberty Mutual Insurance Co.,* 797 F.Supp. 1541, 1546–48 (C.D.Cal.1992), *aff'd,* 41 F.3d 429 (9th Cir.1994), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996); *Norfolk & Western Railway Company v. Accident & Casualty Insurance Company of Winterthur,* 796 F.Supp. 929, 936–37 (W.D.Va.1992), *aff'd in part, appeal dismissed in part, re-*

---

together. The railroad may be held liable for damages to its employees if any of its acts proximately caused the personal injuries suffered by its employees, even if there were other contributing causes.

*manded,* 41 F.3d 928 (4th Cir.1994); *North River Insurance Co. v. Huff,* 628 F.Supp. 1129, 1133–34 (D.Kan.1985); *Aetna Casualty & Surety Company of Illinois v. Medical Protective Company of Fort Wayne,* 575 F.Supp. 901, 903 (N.D.Ill.1983); *American Casualty Company of Reading, Pa. v. Heary,* 432 F.Supp. 995, 997 (E.D.Va.1977); *Elston–Richards Storage Co. v. Indemnity Insurance Co.,* 194 F.Supp. 673, 681 (W.D.Mich. 1960), *aff'd,* 291 F.2d 627 (6th Cir.1961); *United States Fire Insurance Co. v. Safeco Insurance Co.,* 444 So.2d 844, 846–47 (Ala.1983); *Arizona Property & Casualty Insurance Guaranty Fund v. Helme,* 153 Ariz. 129, 735 P.2d 451, 457–58 (1987); *Village of Camp Point v. Continental & Casualty Co.,* 219 Ill.App.3d 86, 161 Ill.Dec. 717, 725, 578 N.E.2d 1363, 1371 (1991), *appeal denied,* 143 Ill.2d 636, 167 Ill.Dec. 397, 587 N.E.2d 1012 (1992); *Mason v. The Home Insurance Company of Illinois,* 177 Ill.App.3d 454, 126 Ill.Dec. 841, 843–45, 532 N.E.2d 526, 528–30 (1988); *Cole v. Celotex Corp.,* 588 So.2d 376, 390 (La.Ct.App.1991); *Worcester Insurance Co. v. Fells Acres Day School, Inc.,* 408 Mass. 393, 558 N.E.2d 958, 973 (1990); *Doria v. Insurance Company of North America,* 210 N.J.Super. 67, 509 A.2d 220, 223 (App.Div.1986). A minority of courts adopt the view that it is the effect of the accident, *see Lombard v. Sewerage & Water Board of New Orleans,* 284 So.2d 905, 915–16 (La.1973) ("[t]he word 'occurrence' as used in the policy must be construed from the point of view of the many persons whose property was damaged. As to each of these plaintiffs, the cumulated activities causing damage should be considered as one occurrence, though the circumstances causing damage consist of a continuous or repeated exposure to conditions resulting in damage arising out of such exposure"); *Anchor Casualty Co. v. McCaleb,* 178 F.2d 322, 324–25 (5th Cir.1949), or the event that triggers liability, *see Arthur A. Johnson Corp. v. Indemnity Insurance Company of North America,* 7 N.Y.2d 222, 196 N.Y.S.2d 678, 682–85, 164 N.E.2d 704, 707–08 (1959); [12] *Shamblin v. Nationwide Mutual*

---

12. The test adopted by the New York Court of Appeals has been denominated an "unfortunate events" test. There is much similarity

*Insurance Co.,* 175 W.Va. 337, 332 S.E.2d 639, 643–44 (1985), that controls.

The parties are not in disagreement as to the test that controls the resolution of this case. They agree that the applicable test is the "cause" test. Application of that test also seems to be required when the terms of the subject policies are taken into account. Considered from the standpoint of the definition of "occurrence" and the "limits of liability" in all of the policies, the occurrence "results in" personal injury or property damage or such injury or damage "arises out of" an occurrence. *See Chemstar, Inc., supra,* 797 F.Supp. at 1546.

The crux of this appeal then is what the parties cannot agree on—the very issue submitted to the jury—namely, what is the cause of the NIHL claims in this case?

## B.

This case makes clear what, in truth, is easily demonstrable, namely that, in many cases, the cause of an injury or damage is neither obvious nor easily discernable. The parties' position in this case, indeed, the cases upon which they rely, make this point quite clearly.

CSXT argues that "occurrence," both by definition and as used in the various excess liability policies, "contemplate[s] multiple claims resulting at different times from one occurrence." Thus, it relies upon and emphasizes cases applying the "cause" test, in which the event that has been determined to be the proximate cause and the resulting damage or injury do not have a direct nexus, those in which the timing and location of the various injuries are, or may be, different. *E.g., Mead Reinsurance, supra,* 873 F.2d at 1188 (city's custom or policy of condoning police brutality constitutes one occurrence); *Appalachian Insurance Co., supra,* 676 F.2d at 61

---

between that test and the "cause" test. In most instances, they probably will be identical, since the liability triggering event ordinarily will be the "cause" of the damage or injury to each of the claimants.

(discriminatory practices and policies resulting in a number of employee claims throughout the nation over many years constituted but one occurrence); *Champion, supra,* 546 F.2d at 505–06 (proximate cause of 1400 claims for defective vinyl paneling was sale of the paneling); *Chemstar, Inc., supra,* 797 F.Supp. at 1546–48 (failure to warn of a defect in product resulting in 28 claims for damage was one occurrence); *Air Products & Chemicals, Inc. v. Hartford Accident & Indemnity Co.,* 707 F.Supp. 762, 771–73 (E.D.Pa.1989) (sale of welding products and asbestos-containing products constitutes an occurrence), *aff'd in part, vacated in part, remanded,* 25 F.3d 177 (3d Cir.1994); *Uniroyal, Inc. v. Home Insurance Co.,* 707 F.Supp. 1368, 1380–87 (E.D.N.Y.1988) (continuous and repeated deliveries of agent orange to the military constituted a single occurrence, resulting in 2.5 million claims for a variety of injuries); *Owens–Illinois v. Aetna Casualty & Surety Co.,* 597 F.Supp. 1515, 1527–28 (D.D.C.1984) (same); *The Atchison, Topeka and Santa Fe Railway Co. v. Stonewall Insurance Co.,* No. 94–CV–1464 (Kan.Dist.Ct. Sept. 18, 1995) (proximate cause of 3,670 NIHL claims was railroad company's failure to implement a hearing conservation program), *appeal docketed,* No. 95–75227–A (Kan.Ct.App. Sept. 29, 1995).

By way of contrast, the insurers rely on cases involving NIHL in which an argument very similar to that made by CSXT in the instant case was considered and rejected. *Norfolk & Western Railroad Co., supra,* 796 F.Supp. at 936–37; *Illinois Central Railroad Company v. Certain Underwriters at Lloyd's,* C.A. No. 91–CV–90 (S.D.Ill., Jan. 21, 1993). In the former case, the railroad contended that the single occurrence causing the claimants' NIHL was its "negligence in failing to protect its employees from the hazards of . . . noise. . . ." 796 F.Supp. at 937. Rejecting that theory as a matter of law, the court opined:

> The railroad's argument allows the cause test to be sweep too broadly and arrives at a result which defies common sense. Many different sounds damaged the hearing of many employees in many places over the course of many years, making this case one in which multiple occurrences

created multiple injuries.... [A] relevant occurrence might be the generation of noise by a particular machine or by a number of machines in a particular ... plant.... The occurrence contemplated by the language of the policies cannot logically be the railroad's system—wide negligence with respect to its employees, however. The railroad's argument is flawed to the extent that it removes any limit from the category of things which might be found to be a cause. [By proffering an analysis designed to] maximize coverage, the railroad has attempted to convert the cause test into a rubber stamp which would justify coverage in every case. This is a misapplication of the cause test which leads to an implausible interpretation of the occurrence language.

*Id. See also Babcock & Wilcox, supra,* 53 F.3d at 768.

This sentiment finds expression in other cause test cases, as well. For example, in *Elston–Richards Storage Co., supra,* 194 F.Supp. at 677, the court determined that the cause of the damage to each of the appliances damaged while stored in the plaintiff's warehouse was a defective carton clamp on a lift truck. Nevertheless, the court found that the damage to each appliance resulted from a separate event or occurrence. It explained:

In the present case the damage to the Whirlpool appliances, though resulting from a single cause, occurred from time to time and from day to day over a period of about nine months. The factual situation involved and the court's holding in the *Johnson* case[13] would seem to support the

---

**13.** *Arthur A. Johnson Corp. v. Indemnity Insurance Company of North America,* 7 N.Y.2d 222, 196 N.Y.S.2d 678, 164 N.E.2d 704 (1959). In that case, companies were hired to construct the platform extensions to certain subway stations, requiring a trench excavation at the subbasement level and the removal of the vaults under the sidewalk in front of two adjoining, but separate, buildings. The company constructed two temporary, but separate cinder block walls to close off the front of each building. A heavy rainfall subsequently caused sewage to overflow and the trench to fill with water, which exerted pressure on the cinder block walls, causing damage to both buildings. *Id.* 196 N.Y.S.2d at 679–81, 164 N.E.2d at 704–05. Each building collapsed about one hour apart.

defendant's contention in the present case that the impact upon each cartoned appliance was a separate impact and therefore that there was more than one accident, that is, more than "one event or occurrence."

*Id.* at 681.  Similarly, in *North River Insurance Co., supra,* the court recognized that loan transactions involving the same method of financing were nonetheless separate loan transactions, where they "occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral."  628 F.Supp. at 1133.  *See also Worcester Insurance Co., supra,* 558 N.E.2d at 973.  And, in *Mason, supra,* 126 Ill.Dec. at 844, 532 N.E.2d at 529, the court pointed out:

> Serving to a consumer a food item contaminated with the botulism toxin constituted the act from which liability arose.  Each instance in which a customer was presented with tainted food over the three day period created additional exposure to liability and constituted a separate occurrence under the policy.  No plaintiff was subjected to either a

---

The New York Supreme Court, Appellate Division, affirmed the trial court's ruling that, for the purposes of an insurance contract providing damages for each accident in a specified amount and a larger amount for aggregate operations, "the impact upon each building was a separate and single accident, even though several distinct and visible operations of plaintiffs relating to each building combined to bring about that result."  6 A.D.2d 97, 175 N.Y.S.2d 414, 422 (1958).  The Court of Appeals also affirmed, observing

> [T]he catastrophe was not the rains—that, in itself, did no harm.  It was the breach of the wall letting the rain water in.  Furthermore, if the walls were located blocks away from each other on different job sites but subject to the same rainfall, no one could contest that there were two accidents . . . .
>
> $\ast$ $\quad$ $\ast$ $\quad$ $\ast$ $\quad$ $\ast$ $\quad$ $\ast$ $\quad$ $\ast$
>
> We think it worthy of mention that the carrier is not aided by the rationale of those cases which it cites to the effect that, where there is one act of negligence as the proximate continuing cause of all the injuries, there is but one accident.  In the instant case, it cannot be said that one would allege but one act of negligence as the proximate cause of the injuries to the two separate properties.  Here the proximate cause cannot be said to be the heavy rainfall but separate negligent acts of preparing and constructing separate walls which, for all we know, may have been built at separate times by separate groups of workmen.

196 N.Y.S.2d at 684, 164 N.E.2d at 708.

continuous or repeated exposure to conditions causing injury. These circumstances did not present one uninterrupted and continuing cause, but several distinct acts—individual sales to separate patrons over a three day period—each of which resulted in exposure to liability.

In *Cole, supra,* 588 So.2d at 390, one of the appellees argued that, under policy language similar to that contained in the limits of liability section of the insurance policies at issue here, a failure to provide a safe work place for the plaintiffs constituted a single occurrence. That finding was challenged on appeal. In that case, the trial court made findings of fact that the plaintiffs had not been exposed to substantially the same general conditions. The Louisiana appellate court held that the trial court's findings were supported by the record. *Id.* It went on to quote, with approval, the decision in *Ducre v. Mine Safety Appliances Co.,* 645 F.Supp. 708, 713 (E.D.La. 1986), *aff'd,* 833 F.2d 588 (5th Cir.1987):

It is inaccurate to assert that all the plaintiffs were injured by a single condition—exposure to silica dust. The conditions at Avondale's facilities giving rise to the silicosis claims were scattered and varied. The claimants were exposed to different levels of silica dust at different times, under a variety of conditions, at diverse job sites, and with different types of protection over long periods of time. Thus, it is appropriate to consider the harm visited upon each plaintiff as being a separate event, and to consider the event as occurring each year.

*Cole, supra,* 588 So.2d at 391.

## C.

It is not our task, as an appellate court, to determine what caused the NIHL claims at issue here. That is especially the case when, as here, the issue was submitted to the jury for determination and neither party has questioned the propriety of having done so. When a case has been submitted to the

jury for decision, a party unhappy with the verdict may only challenge the sufficiency of the evidence,[14] or the adequacy of the instructions. In this case, CSXT does not argue, at least not explicitly, that there was insufficient evidence in the record to warrant submission of the appellees' position on the issue of proximate cause to the jury. We are left, therefore, to determine the adequacy of the instructions actually given and the correctness of the trial court's decision not to give others requested by CSXT.

▪▪▪ Maryland Rule 2–520(c) provides:

The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

It is well settled that if, when read as a whole, the court's instructions to the jury clearly set forth the applicable law, there is no reversible error. *See Nizer v. Phelps*, 252 Md. 185, 202–03, 249 A.2d 112, 122 (1969); *Alston v. Forsythe*, 226 Md. 121, 135, 172 A.2d 474, 481 (1961). A proposed instruction that is " 'a correct exposition of the law,' " that is " 'applicable in light of the evidence before the jury,' " and is not " 'fairly covered by the instructions actually given,' " *Holman v. Kelly Catering, Inc.*, 334 Md. 480, 495–96, 639 A.2d 701, 709 (1994) (quoting *Wegad v. Howard Street Jewelers*, 326 Md. 409, 414, 605 A.2d 123, 126 (1992)), must be given. By not objecting "on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection[,]" Maryland Rule 2–520(e), a party waives any error that failing to give an instruction may constitute. *Id. See Barwood, Inc. v. Georgi*, 253 Md. 29, 30, 251 A.2d 596, 597 (1969).

---

**14.** The sufficiency of the evidence may be challenged only if the party moved for judgment at the conclusion of the evidence. *See* Maryland Rule 2–519.

## D.

Before considering the instructions proposed by CSXT, which it contends the court should have given, it is necessary to review briefly those that were given.

As indicated, the trial court instructed the jury that whether there has been an "occurrence," as used in the policies, is to be determined by reference to the proximate cause of the injury or damage at issue. "Proximate cause," the jury was informed, was "the cause which is nearest in the order of responsible causation to the resulting injuries, the cause which, in a natural and continuous sequence, unbroken by any efficient intervening cause, logically and probably produces the injury." The court then stated CSXT's position and that of the insurers, with regard to the "occurrence" issue. CSXT does not now, and did not then, object or complain that the trial court mischaracterized its position.

CSXT does not argue, nor could it, that the proximate cause instruction was deficient. Not only is that instruction consistent with the view of proximate cause held by the Maryland courts, as we have seen, but it defines that concept consistently with the definition given it by the very cases upon which CSXT relies. *See e.g., Mead Reinsurance, supra,* 873 F.2d at 1188 (adopting the reasoning of *Appalachian Insurance Co., supra*); *Appalachian Insurance Co., supra,* 676 F.2d at 61 (having stated the general rule, the cause test, the court explained "[u]sing this analysis, the court asks if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injures and damage'") (quoting *Bartholomew v. Insurance Company of North America,* 502 F.Supp. 246, 251 (D.R.I.1980), *aff'd sub nom. Bartholomew v. Appalachian Insurance Co.,* 655 F.2d 27 (1st Cir.1981)); *Champion, supra,* 546 F.2d at 505–06 (per occurrence policy focuses "on the underlying circumstances which resulted in the claim for damages"); *Chemstar, Inc., supra,* 797 F.Supp. at 1546 (noting that causation rule and the policy at issue in that case look to "the underlying cause of property damage"); *Air Products & Chemicals, Inc., supra,* 707 F.Supp. at 773 (underlying

circumstances resulting in the claim for damages); *Owens–Illinois, supra,* 597 F.Supp. at 1525 ("Given the policies' definitions of 'occurrence' and the policies' unifying definitional provisions, the calculation of the number of occurrences must focus on the underlying *circumstances* which resulted in the personal injury and claims for damages rather than each individual claimant's *injury.*").

■ What CSXT does argue is that the trial court erred when it refused to supplement the proximate cause instruction, with its "common cause" instruction. Under that instruction, rather than determining the proximate cause of each injury as the basis for determining when there has been an occurrence, there would be one "occurrence" whenever the cause of all injuries is the same, *i.e.* a "common cause." Although it has never been included in a jury instruction, CSXT insists that the jury should have been told that injuries resulting from a common cause form one occurrence, notwithstanding differences in their timing, location or magnitude. With respect to this issue, the question for decision, therefore, is whether CSXT's "common cause" instruction was an appropriate instruction and, if it was, whether it was fairly covered by the proximate cause instruction that was given.

In addition to proximate cause, the jury was instructed as to the meaning of the "limit of liability" section of the policies. It was told, in that regard, that NIHL claims arising out of substantially the same general conditions existing in, or emanating from, a particular location or source were to be considered as arising out of, or having resulted from one occurrence. Considered together, the proximate cause and "limit of liability" instructions not only required the jury to determine the proximate cause of each of the NIHL claims, but permitted it to aggregate such of those subject NIHL claims that were caused by the same occurrence, *i.e.,* those that arose out of, or emanated from, substantially the same general condition existing at or emanating from a particular location or source.

Taken together, therefore, the instructions given "were broad enough to permit counsel to fit proper arguments within

them." *Aronstamn v. Coffey,* 259 Md. 47, 50, 267 A.2d 741, 743 (1970). They did not foreclose CSXT from making its common cause argument—all of the NIHL claims were caused by unprotected exposure to hazardous noise and the railroad's failure to mandate hearing protection. In point of fact, CSXT made that very argument *albeit* unsuccessfully. Accordingly, because CSXT could, and did, present the very arguments to the jury that it would have made had its instructions been given, the matter was fairly, and adequately, covered in the instructions actually given. The trial court's refusal to give the common cause instruction, therefore, was not error. *See* Maryland Rule 2–520(c); *Kennelly v. Burgess,* 337 Md. 562, 577, 654 A.2d 1335, 1342 (1995).

■ Moreover, for another reason, the proposed instruction should not have been given. It assumes the very point that the jury was required to decide. To have given that instruction would have been tantamount to directing a verdict in favor of CSXT. This is so because once the jury determined that unprotected exposure to hazardous noise was the proximate cause of NIHL claims in general, it would have had no option other than to find one hazardous occurrence for each management group. For that reason, as well, the trial court properly refused to give the "common cause" instruction.[15]

### E.

■ A similar analysis applies with regard to CSXT's proposed instruction that "a failure to act" can be the cause of injury. That point was fairly covered by the instructions given. Immediately following its explanation of proximate

---

**15.** Viewed another way, it is at least arguable that the "common cause" instruction proposed by CSXT was not an accurate exposition of the law. The effect of CSXT's proposed instruction was to aggregate all of the NIHL claims brought against the railroads, without regard to the excess liability requirements of the policies. The policies, as we have seen, permitted aggregation, but only when there was continuous or repeated exposure to substantially the same conditions existing at or emanating from one location or source. The common cause instruction would have read the limit of liability section out of the policies.

cause, the trial court reminded the jury of the parties' positions in the litigation. It explained that CSXT's position was that the cause of the NIHL claims was a failure to act, *i.e.* the railroads' failure to require mandatory hearing protection. Indeed, there was nothing in the instructions given, including the proximate cause instruction, that undermined that instruction.

CSXT's proposed "multiple cause" instruction [16] was properly refused by the trial court. It simply was not " 'applicable in light of the evidence before the jury[.]' " *Holman, supra,* 334 Md. at 495, 639 A.2d at 709 (quoting *Wegad, supra,* 326 Md. at 414, 605 A.2d at 126). That CSXT may be liable to claimants in an underlying personal injury case "even if there were other contributing causes," has nothing whatever to do with the proximate cause issue in this case.

■ Nor is there any merit to CSXT's contention that the jury was instructed that the excess insurance policies do not protect against liability for "high frequency, low severity losses" even if they result from a common cause. The instruction to which CSXT refers is one proposed by the insurers and adopted by the trial court to define "self-insured retention." After defining "self-insured retention" for the jury, the instruction informs the jury of its purpose:

> The purpose of self-insurance of this type is to protect against high frequency, low severity losses, without incurring the additional premium expense that a policyholder would pay to an insurance company that would reflect the company's general expenses associated with handling such high frequency, low severity losses.

The court's intention in so instructing the jury was to explain to the jury the concept of SIR so that it could decide the case fully aware of the obligations of each party to the insurance contract. It succeeded in its purpose: it accurately defined SIR and correctly stated its purpose. Contrary to CSXT's

---

**16.** See footnote 11 *supra.*

contention, the instruction was correctly focused and appropriately given.

## F.

■ CSXT also argues that the trial court erroneously instructed the jury with regard to the "one occurrence clause." Specifically, it complains about the inclusion of the modifier, "particular," before the words "locations" and "sources." CSXT contends that, in addition to being inconsistent with the "common cause test," that modification of the section significantly changes its meaning—from minimizing to maximizing the number of occurrences. Moreover, CSXT asserts that, as used in the clause, the term "source" is ambiguous, being susceptible to more than one meaning. That this is so is demonstrated, it points out, by the contrary positions the parties took during trial—CSXT contending that "source" meant "cause," while the insurers maintained that it meant particular pieces of noisy equipment—and by the court's having found it necessary to insert the word "particular" before "location" and "source" in the jury instructions on the subject.

Before addressing the latter issue, we first consider CSXT's argument that the court's interpretation of the "one occurrence" clause was flawed. Taking issue with the notion that NIHL can be attributed to "particular" noisy equipment, it contends that the clause, as interpreted, "applies an impracticable means of determining the number of occurrences[,]" (citing *Uniroyal, Inc., supra,* 707 F.Supp. at 1386). To support that conclusion it makes a number of factual assertions concerning how NIHL occurs, *i.e.,* that it occurs over time, and, due to the mobility of both the worker and the machinery, may result from exposure to many different pieces of equipment.

Rather than assisting CSXT, adopting CSXT's view of the "one occurrence clause" section, supports the insurers' position. As we have seen, that section requires aggregation of claims when they arise out of continuous or repeated exposure to substantially the same general conditions existing at, or emanating from, one location or source. Patently, this provi-

sion contemplates a causal relationship between the occurrence and the claims. In the case of multiple injuries, that causal relationship must extend to each of the claims. *See Arizona Property & Casualty Insurance Guaranty Fund, supra,* 735 P.2d at 458. Under the "one occurrence" section, it is not enough that the cause of each claim is generically the same—that all have their genesis in the unprotected exposure to hazardous noise, for example. To be considered as having arisen out of one occurrence, the exposure of each claimant must have some commonality with the exposure of the other claimants; each exposure must have occurred at the same place or been caused by the same source. Any other interpretation would result in the aggregation of claims whenever injuries having the same generic cause occur within a single unit, and result in two or more claims. And that is precisely what CSXT argues: whenever it can be shown that the same cause is common to multiple claims, notwithstanding that the claims are unrelated temporally or geographically, there has been only one occurrence.

CSXT recognizes, of course, that there must be a commonality between the claims and the cause of the injuries that gave rise to them and that there must also be a link between the various claims. Ordinarily, the link is the proximate cause of the injuries. CSXT does not disagree. In this case, however, it believes that, the commonality element is satisfied by reference to the common or generic cause of the NIHL claims. Thus, it asserts, because each claim resulted from unprotected exposure to hazardous noise, each claim has a common cause, however disparate, from the standpoint of source, location, and timing, the individual claims may be. That common cause, CSXT asserts, includes its negligence, *i.e.,* its failure to prevent the exposure by mandating the use of hearing protection.

Aside from the fact that it is doubtful that a remedy may, at one and the same time, be the cause of an injury, the "common causes" identified by CSXT are extremely broad and general. Indeed, they are so general that to give effect to them would be to provide greater insurance coverage than the excess

liability policies contemplated, judging from the language of their various applicable provisions. *See Norfolk & Western Railway Co., supra,* 796 F.Supp. at 936–37.

The contention that CSXT's negligence may be a common cause of each claimant's injury is particularly troubling.[17] There is no single identified or identifiable act of negligence, as the insurers point out, that proximately caused each of the injuries that resulted in the numerous NIHL claims. CSXT may very well have been negligent in failing to require mandatory hearing protection for its workers, but its negligence, at the very least, was specific to particular locations and sources, if not to each individual affected. Indeed, negligence in failing to identify the location or source of hazardous noise is a necessary predicate to mandating the use of hearing protection measures. It is, therefore, different from negligently failing to mandate hearing protection. Thus, to say that the railroads were negligent with respect to excessive noise in the work place is not to establish that the railroads' negligence proximately caused each of the noise related injuries that may have occurred in the work place.

---

**17.** CSXT points out that its insurance coverage protects it from, among others, claims filed by its employees under FELA, a negligence-based compensation system, which supplants "no fault" State workers' compensation statutes for non-maritime railroad employees. Thus, CSXT stresses that, under FELA, a claimant has to prove the railroad's negligence. It is interesting that CSXT then indicates that one of the "common causes" of NIHL claims is its own negligence in failing to mandate hearing protection. In so doing, CSXT may be suggesting that the cause contemplated by the cause test must be related to the negligent conduct of the responsible party, *i.e.,* the general liability theory pursued by FELA claimants. The cause test, however, focuses on the specific injury producing conduct, whether it be negligent or not. As between the claimant and the employer or tortfeasor, it is the responsibility of the claimant to establish, when required, that the employer or tortfeasor was negligent. Once that has been done, the employer or tortfeasor is liable, *i.e.,* legally obligated to pay. As between the insured and his or her insurer, the insurance policy controls. Under the policies at issue in this case, the insurer is liable to reimburse its insured for any damages paid in respect of injury arising out of or caused by an occurrence, the continuous or repeated exposure to conditions which result in personal injury. Thus, in that context, it is not necessary that CSXT prove that it was negligent; all it need prove is that it was legally liable to pay as a result of an occurrence.

Similarly, while it is true that all NIHL is caused by exposure to hazardous noise, it does not follow that each instance of NIHL is the product of one or more related exposures. To be sure, therefore, the NIHL suffered by each claimant was caused by hazardous noise and, in that sense, resulted from a common cause; however, the proximate cause of each individual case of NIHL may well be quite different, depending upon the source of the noise, the location at which the exposure occurred, the timing of the exposure, and, perhaps to some extent, the intensity of the exposure. It simply is not true that common cause is synonymous with proximate cause. This point is perhaps best made by drawing an analogy to the familiar context of automobile accidents caused by driver negligence. While driver negligence is the common cause of all such accidents, determining the proximate cause of a particular negligent driver's accident involves a factual analysis of all the relevant circumstances, including the driver's specific negligence, where and when the accident occurred, etc.

CSXT is not, as we have previously noted, the first insured to attempt to generalize the cause test for the purpose of maximizing insurance coverage. As noted earlier, the court in *Norfolk & Western Railway Co., supra,* 796 F.Supp. 929, rejected, as nonsensical, an argument similar to that advanced here. In that case, the railroad argued that it was negligent with respect to the handling of excessive noise in the work place, which, it claimed, was the proximate cause of the NIHL claims brought against it. In *American Red Cross v. Travelers Indemnity Co.,* 816 F.Supp. 755 (D.D.C.1993), the insurer argued that it was the plaintiff's general negligent practice in handling HIV-contaminated blood that caused the claims in that case. The court did not agree, opining:

The facts do not support the suggestion that plaintiff engaged in a single, negligent practice that could be considered "one cause." Rather, plaintiff made many decisions with regard to its handling of the blood—whether to screen the donor, whether to test the blood, and whether to provide warnings to the recipient hospital. Each of these decisions

independently may have affected whether bodily injury would result from a transfusion. Moreover, negligence with regard to screening, testing, or notification could not result in injury until a particular unit of contaminated blood was provided to an entity which would administer the transfusion. Thus, the court declines to resort to the level of generality urged by defendant Travelers in applying the cause test.

*Id.* at 761.

### G.

■ " '[A]n ambiguity does arise if, to a reasonably prudent layman, the language used is susceptible of more than one meaning.' " *St. Paul Fire & Marine Insurance Co. v. Pryseski*, 292 Md. 187, 198, 438 A.2d 282, 288 (1981) (quoting *Truck Insurance Exchange v. Marks Rentals*, 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980)). Whether an insurance policy is ambiguous is a threshold matter which is to be decided by the court as a matter of law. *Sullins v. Allstate Insurance Co.*, 340 Md. 503, 508–09, 667 A.2d 617, 619 (1995); *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388–89, 488 A.2d 486, 489 (1985); *Truck Insurance Exchange*, *supra*, 288 Md. at 433, 418 A.2d at 1190. The trial court properly decided whether the subject clause was ambiguous or unambiguous and its decision in that regard was not clearly erroneous.

While the definition of "source" may include "cause", it is the context in which the term is used that is decisive. One of the bases upon which CSXT contends that "source" is ambiguous is that the court, in *Appalachian Insurance Co.*, *supra*, 676 F.2d at 61, discussing the cause test, recognized that one meaning of "source" is "cause":

Applying the general rule to the facts of this case we agree with the district court's finding that there was but one occurrence for purposes of policy coverage. The injuries for which Liberty was liable all resulted from a common source: Liberty's discriminatory employment policies.

That case is by no means dispositive. In *Dow Chemical Company v. Associated Indemnity Corporation*, 727 F.Supp. 1524, 1531 (E.D.Mich.1989), the court noted:

> As a matter of substantive law, the unlawful policy ... in *Appalachian Insurance Co.* [was] not only the proximate, uninterrupted, and continuous cause[ ] of all injuries suffered, such ... policy [was] the essential element[ ] of the established claims.

Where the generic cause and the more specific cause of a particular injury coalesce, CSXT's argument might have merit. Where, however, the context makes clear that it is a specific cause to which reference is made, rather than the generic cause, there simply is no ambiguity. In that situation, the term "source" could only refer to the cause of the specific injury or claim under review. As used in this case, considered in relationship to "one location," a reasonably prudent lay person would not have interpreted "source" to mean "cause." [18]

Because we determine that the term "source" is unambiguous, it follows that the trial court did not err in excluding extraneous evidence to prove its meaning. *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985); *Missler v. Anne Arundel County*, 271 Md. 70, 80, 314 A.2d 451, 457 (1974); *Hardy v. Brookhart*, 259 Md. 317, 326–27, 270 A.2d 119, 124–25 (1970); *Comptroller of the Treasury v. American Cyanamid Co.*, 240 Md. 491, 506, 214 A.2d 596, 604 (1965); *Holloway v. Faw, Casson & Co.*, 78 Md.App. 205, 246, 552 A.2d 1311, 1331 (1989), *aff'd in part, rev'd in part*, 319 Md. 324, 572 A.2d 510 (1990); *Admiral Builders Sav. & Loan Assoc. v. South River Landing, Inc.*, 66 Md.App. 124, 130, 502 A.2d 1096, 1098 (1986). Thus, it was not

---

**18.** Applying the rules of statutory construction, the same result would be reached. To interpret "source" as meaning "cause" would be to read the term "location" out of the clause. That would contravene the well settled canon that no word in the clause to be construed should be read so as to render another meaningless, surplusage, superfluous or nugatory. *See Prince George's County v. Vieira*, 340 Md. 651, 658, 667 A.2d 898, 901 (1995); *GEICO v. Insurance Comm'r*, 332 Md. 124, 132, 630 A.2d 713, 717 (1993); *Management Personnel Services v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 315 (1984).

reversible error for the trial court to refuse to permit CSXT's expert to testify as to the meaning of the term, "source." That being so, assuming that the trial court was mistaken in believing that the expert had been designated too late, CSXT suffered no prejudice. We simply will not reverse a judgment when there has been no prejudice. *Harris v. David S. Harris, P.A.*, 310 Md. 310, 319, 529 A.2d 356, 360 (1987); *Master Royalties Corp. v. City of Baltimore*, 235 Md. 74, 96, 200 A.2d 652, 664 (1964); *Hughes v. Averza*, 223 Md. 12, 19, 161 A.2d 671, 675 (1960).

The "one occurrence clause" was not drafted to protect railroads from NIHL claims. Its focus is much more general. Rather than a matter of interpretation, the factual assertions made by CSXT were matters for the jury to determine when considering whether to aggregate the NIHL claims. Moreover, and, in any event, the evidence upon which the factual assertions made by CSXT were based was presented to the jury. It is apparent from its verdict that the jury rejected those assertions.

■ The adequacy of the evidence admitted to apprise the jury of the nature and extent of the agreement between the parties is another matter about which CSXT complains. Specifically, it alleges that by admitting only 5 of 246 insurance policies, and heavily redacting those five, the jury was not adequately informed of the nature and extent of the coverage the excess liability policies provided CSXT. According to CSXT, in redacting the policies, certain provisions which made it clear that an occurrence could include more than one claim, i.e. those providing for aggregation of multiple claims into one occurrence, the definition of bodily injury to include long-term bodily injury and sickness, and the per occurrence limits and deductibles were excluded. In its view, the exclusion of the policies themselves and, more particularly, of those specific provisions, led the jury to find that each NIHL claim was a separate occurrence.

■ It is well settled that, when conducting a trial, a trial court has wide discretion to admit or exclude evidence.

*Graves v. State,* 334 Md. 30, 41, 637 A.2d 1197, 1203 (1994); *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258, 273 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993); *Prout v. State,* 311 Md. 348, 363, 535 A.2d 445, 452 (1988); *Raithel v. State,* 280 Md. 291, 300, 372 A.2d 1069 (1977); *Belle Isle Cab Co. v. Trammell,* 227 Md. 438, 448, 177 A.2d 404, 409 (1962). *See also Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590, 615 (1974). This principle is no less true when the exclusion occurs in connection with the redaction of a document, whose meaning is at issue, preliminary to that document's being admitted into evidence and submitted to the jury. The trial court's decision to exclude evidence, or to admit it, for that matter, will not be set aside in the absence of an abuse of discretion. *Bohnert v. State,* 312 Md. 266, 275–76, 539 A.2d 657, 662 (1988); *Bloodsworth v. State,* 307 Md. 164, 185–186, 512 A.2d 1056, 1067 (1986); *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472, 476 (1977); *Oaks v. State,* 83 Md.App. 1, 9, 573 A.2d 392, 395 (1990). *See also Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460–61, 110 L.Ed.2d 359, 382 (1990).

There was never any doubt as to what the real issue was in this case: what constitutes an occurrence and how many of them there were. Nor was it a mystery that CSXT was attempting to convince the jury to return a verdict finding the fewest possible number of occurrences and that the insurers were seeking the opposite result—a verdict finding the maximum possible number of occurrences. The jury was instructed as to how, and when, multiple claims were to be aggregated. Under these circumstances, it is inconceivable that the jury was unaware that an occurrence could consist of more than one claim. Moreover, as the trial court indicated, the redactions were made necessary by the limited issue being tried. Thus, while some of the redacted provisions may very well have buttressed CSXT's argument that an occurrence may consist of more than one claim, such provisions were unnecessary to the resolution of the issue being tried. The jury was adequately apprised of what its responsibilities were; it was told expressly that it could aggregate claims into one

occurrence. The trial court did not abuse its discretion in redacting the policies.

CSXT suggests that, by instructing the jury that, to be aggregated, the claims must have emanated from a particular source, the court insured that CSXT could not have succeeded in aggregating the claims, since, given the mobility of equipment and personnel in the railroad industry, no particular noisy equipment could cause a particular claimant's NIHL. For this argument, CSXT focuses solely on the word "source" in the "Limits of Liability" section. CSXT also could have proven its entitlement to aggregate the NIHL claims by linking the claims together on the basis of the location at which the claimants worked. By focusing on the "negligence" of the railroads in failing to mandate hearing protection for its workers, CSXT forewent that option.

## IV.

We do not reach the issue whether the jury was properly instructed as to the meaning of the word "accident." CSXT has conceded that its position would be the same whether or not the applicable policies contained the "accident" language. Accordingly, the jury's verdict as to the number of occurrences is dispositive, whether or not the claims arose from "accidents."

Similarly, we do not reach the occupational disease issue. The jury having found that each separate NIHL claim arose out of separate occurrences, each claim being less than the SIR portion of the liability loss, whether NIHL is an occupational disease simply is no longer relevant to the resolution of this case; it is moot. *See Ro v. Heredia,* 341 Md. 302, 309, 670 A.2d 459, 463 (1996); *Attorney General v. Anne Arundel Co. School Bus Contractors Assoc.,* 286 Md. 324, 327, 407 A.2d 749, 751 (1979); *Marzullo v. Kovens Furniture Co. of Baltimore,* 253 Md. 274, 275, 252 A.2d 822, 823 (1969); *Grau v. Board of Zoning Appeals of Baltimore County,* 210 Md. 19, 23, 122 A.2d 824, 826 (1956); *Munder v. Purcell,* 188 Md. 115, 118, 52 A.2d 923, 924–25 (1947).

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.*